(May 14, 1910.)

# MARTIN WALSH, Respondent, v. WINSTON BROS. COMPANY, a Corporation, Appellant.

### [111 Pac. 1090.]

MOTION FOR POSTPONEMENT OF TRIAL—FELLOW-SERVANT—ASSUMPTION OF RISK—DUTY OF MASTER—CONFLICT OF EVIDENCE—MISCONDUCT OF JUROR—NEW TRIAL.

(Syllabus by the court.)

1. A motion for a new trial is addressed to the sound discretion of the trial court, and the court's ruling thereon will not be disturbed on appeal unless it appears there has been an abuse of such discretion.

2. A party is not entitled to a continuance without showing due diligence and the use of legal means to procure the desired evidence, or a clear and sufficient excuse for not resorting to such legal means. A bare request to furnish the evidence is in no sense a compliance with the requirements of the law.

3. In an action to recover damages for personal injuries, evidence which tends to show the respective duties and relations of the alleged principal and his employees, as well as their relations to the business generally, and all of the surrounding circumstances, is admissible to aid in determining whether the injured employee sustained such injury by reason of the negligence of a fellow-servant or of a vice-principal.

4. Evidence in this case examined and *held* to support the verdict of the jury.

5. *Maloney v. Winston Bros. Co., ante*, p. 740, 111 Pac. 1080, cited and approved as the law governing this case.

6. It is not error for the trial court to deny a motion for a new trial on account of the intoxication of a juror, where it clearly appears that such intoxication is brought on by the indulgence of the juror during a recess of the court and when the jury is permitted to separate, and no motion is made at the time that the panel be discharged and a new jury selected, or that the particular juror be discharged and another juror selected in his stead, or any objection made to resuming the trial on account of the intoxication of such juror, and it further clearly appears as a fact that the trial was not resumed until the juror had fully recovered his normal condition and faculties, although such conduct of the juror calls for severe censure and punishment from the trial court.

APPEAL from the District Court of the First Judicial District, for Shoshone County.    Hon. W. W. Woods, Judge.

An action to recover damages for personal injury.    Judgment for plaintiff.    Defendant appeals.    Judgment *modified* and *affirmed.*

Kerns & Ryan, for Appellant.

The accident in the case at bar was caused from the nature of the work and not from the place where he was working. It was one of the risks incident to the kind of work in which he was employed.    This we believe is a true test.    (*Cullen v. Norton,* 126 N. Y. 1, 26 N. E. 905; 2 Labatt on Master and Servant, sec. 600; *Perry v. Rogers,* 157 N. Y. 251, 51 N. E. 1021; *Capasso v. Woolfolk,* 163 N. Y. 472, 57 N. E. 760; *Vitto v. Farley,* 36 N. Y. Supp. 1105, 15 Misc. 153; *Porter v. Silver Creek & M. Coal Co.,* 84 Wis. 418, 54 N. W. 1019.)

After the defendant has furnished the proper instrumentalities and competent employees, it has discharged its duty.    It is presumed, in the absence of any evidence to the contrary, that any duty which the law imposes has been properly performed and a servant must, in order to make out a *prima facie* case which will entitle him to go to the jury, produce some evidence which tends to destroy the force of the presumption in the given instance.    (Labatt on Master and Servant, sec. 832; *Patton v. Texas & Pacific Ry. Co.,* 179 U. S. 658, 21 Sup. Ct. 275, 45 L. ed. 361; *Stearns v. Ontario Spinning Co.,* 184 Pa. 519, 63 Am. St. 807, 39 Atl. 292, 39 L. R. A. 842.)

Upon problematical causes negligence cannot be predicated. (*Minty v. Union Pacific R. Co.,* 2 Ida. 471, 21 Pac. 660.)

"The master is not under any duty to warn or instruct servants who have already enjoyed an ample opportunity to become acquainted with the danger.    Servants are expected to keep their eyes open, and exercise such reasonable care for their own safety as their situation permits."    (4 Thompson on Negligence, sec. 4065; *McGowan v. Nelson,* 36 Mont. 67, 92 Pac. 40.)

"A master is not required to furnish the servant with a safe place to work as against a danger which is temporary, and arises from the hazard and the progress of the work itself, and is known to the servant, who in such case assumes the risk therefrom." (*Davis v. Mining Co.*, 117 Fed. 122, 54 C. C. A. 636; *Armour v. Hahn*, 111 U. S. 313, 4 Sup. Ct. 433, 28 L. ed. 440; *Nolan v. Shickle*, 3 Mo. App. 300; *Schultz v. Pacific Ry. Co.*, 36 Mo. 13; *Koontz v. C. R. I. & P. R. Co.*, 65 Ia. 224, 54 Am. Rep. 5, 21 N. W. 577; *Sjogren v. Hall*, 53 Mich. 274, 18 N. W. 812; *McKee v. C. R. I. & P. R. Co.*, 83 Ia. 616, 50 N. W. 209, 13 L. R. A. 817.)

"The foreman of a gang of laborers employed by a contractor is a fellow-servant of one of the gang." (*Anderson v. Winston*, 31 Fed. 528; *McDonald v. Buckley*, 109 Fed. 290, 48 C. C. A. 372; *New England Ry. Co. v. Conroy*, 175 U. S. 323, 20 Sup. Ct. 85, 44 L. ed. 181; *Armour v. Hahn, supra; Chicago & Ohio C. & C. Co. v. Norman*, 49 Ohio St. 598, 32 N. E. 857; *Beesley v. Wheeler Co.*, 103 Mich. 196, 61 N. W. 658, 27 L. R. A. 266; *Shaw v. Gold Mines Co.*, 31 Mont. 138, 77 Pac. 515; *Larsen v. Le Doux*, 11 Ida. 49, 81 Pac. 600.)

Gray & Knight, John H. Wourms, and Walter H. Hanson, for Respondent.

It was the duty of the appellant to furnish and maintain a reasonably safe place for the plaintiff to work. (*Bunker Hill & Sullivan M. & C. Co. v. Jones*, 130 Fed. 813, 65 C. C. A. 363; *Rowden v. Schoenherr-Walton M. Co.*, 136 Mo. App. 376, 117 S. W. 695; *Trihay v. Brooklyn Lead Min. Co.*, 4 Utah, 468, 11 Pac. 612; *Union Pac. Ry. Co. v. Jarvi*, 53 Fed. 65, 3 C. C. A. 433; *Ross v. Shanley*, 85 Ill. 390, 56 N. E. 1105; *Illinois Steel Co. v. Schymanowski*, 162 Ill. 447, 44 N. E. 876; *Ohio Copper Min. Co. v. Hutchings*, 172 Fed. 201, 96 C. C. A. 653.)

The master is liable for the negligence of an employee who represents him in the discharge of his personal duties to his servants. (*Larsen v. Le Doux*, 11 Ida. 49, 81 Pac. 600; *Bunker Hill & Sullivan M. & C. Co. v. Jones, supra; Hough v. Texas & Pacific Ry. Co.*, 100 U. S. 213, 25 L. ed. 612; *Crist v.*

*Wichita Gas, Electric Light & Power Co.,* 72 Kan. 135, 83 Pac. 199.)

The facts in this case show that there was nothing to indicate to the plaintiff, from such inspection as he could or was permitted under the rules and practice of the tunnel to make, that he was assuming any such danger as the accident showed existed. He was justified in assuming that the master, either personally or through its representative, had properly inspected and safeguarded the place in which he was to work. (*Choctaw etc. R. Co. v. McDade,* 191 U. S. 64, 24 Sup. Ct. 24, 48 L. ed. 96; *Texas & Pacific Ry. v. Archibald,* 170 U. S. 665, 18 Sup. Ct. 777, 42 L. ed. 1188; *Texas & Pacific Ry. Co. v. Swearingen,* 196 U. S. 51, 25 Sup. Ct. 164, 49 L. ed. 382; *Choctaw v. Holloday,* 191 U. S. 334, 24 Sup. Ct. 102, 48 L. ed. 207; *Kreigh v. Westinghouse, Church, Kerr & Co.,* 214 U. S. 249, 53 L. ed. 984; *Ohio Copper Min. Co. v. Hutchings,* 172 Fed. 201, 96 C. C. A. 653; *Island Coal Co. v. Risher,* 13 Ind. App. 98, 40 N. E. 158; *Diamond Coal Co. v. Cuthbertson,* 166 Ind. 290, 76 N. E. 1060; *National Steel Co. v. Hore,* 155 Fed. 62–65; 83 C. C. A. 578.)

Even though the trial court refused to allow a question directed to a juror which might have demonstrated his incompetency, yet if the appellant did not make a peremptory challenge of such juror and had not exhausted all of his peremptory challenges, such error on the part of the trial court would not be reversible error. (*Asevado v. Orr,* 100 Cal. 293, 34 Pac. 777; *Anarchists' Case,* 122 Ill. 1, 3 Am. St. 320, 12 N. E. 865, 17 N. E. 898; *Salazar v. Taylor,* 18 Colo. 538, 33 Pac. 369; *Williams v. State,* 30 Tex. App. 354, 17 S. W. 408; *Davidson v. Bordeaux,* 15 Mont. 245, 38 Pac. 1075.)

STEWART, J.—This is an action brought to recover damages for personal injuries alleged to have been sustained by the plaintiff and caused by the defendant's negligence while in the employ of the defendant in the construction of a certain tunnel along the line of the Chicago, Milwaukee and St. Paul railroad known as the St. Paul Pass tunnel, being a tunnel beneath the divide of the Bitter Root Mountains be-

tween the states of Idaho and Montana. The cause was tried to a jury and a verdict returned for the plaintiff in the sum of $20,000. A motion for a new trial was made and overruled. This appeal is from the judgment and from the order overruling a motion for a new trial.

When the case was called for trial on June 1, 1909, the appellant made a motion for a postponement of the trial until the next term of court. This motion was based upon the affidavit of one E. G. Trimper. In this affidavit Mr. Trimper swears that he is the agent of the Ocean Accident Insurance Corporation, who assured Winston Bros. Company with respect to the employees engaged in the construction of the St. Paul Pass tunnel, and as such has had charge, and it has been made his duty to prepare the above-entitled cause for trial; that after the case was set for trial on the —— day of April, 1909, he began to investigate and locate the whereabouts of the witnesses and arrange for their attendance; that one William Ryan is an important witness. Then follows what it is claimed Ryan will testify to. The affidavit states that the affiant is informed and believes that Ryan is in the state of California and beyond the jurisdiction of the court, and that he could not be located in time to take his deposition before the day set for the trial; and affiant believes that if the action be continued, by the next term of court the attendance of the witness could be procured or his deposition taken. The affidavit then alleges that one George Parr is a material and important witness and states what such witness, if present, would testify to; that such witness is not, and has not been, within the jurisdiction of the court for some months last past; that as soon as this case was set for trial affiant made effort to locate the said witness and procure his attendance; that he located the witness in the city of Spokane, Washington, only a few days prior to the time of making the affidavit and too late to take his deposition, but that he saw the witness, and the witness promised that he would be present at the trial, but that the witness failed to keep such promise; that affiant lately learned that the witness had gone to California; that as soon as affiant found that the witness was not here on May

31st, he instituted inquiries to ascertain why, and learned that the witness had been called to California, and that if the cause be continued over the present term, the witness could be procured or his testimony can be had at the next term; that Dr. T. J. White is an important witness, and then follow the facts such witness will testify to; that said witness at the time the affidavit was made was in charge of patients at work along the line of the Chicago, Milwaukee and Puget Sound Railway on the St. Joe river, and agreed with affiant that he would attend this trial, and was in Wallace on the 30th and 31st days of this month, and on the morning of the 31st left Wallace by train and went to Taft; that affiant talked with the witness over the phone and requested the witness to return, and the witness told affiant that he had been called to the camps; that his personal presence was necessary, and that he was unable to get anyone to take his place, and it would be impossible for him to return; that he would remain in Wallace except for the fact that he was called away on account of sickness; that by reason of his employment by the Ocean Accident & Guaranty Corporation he is also the acting claim agent of Winston Bros., and has committed to him the preparation of the trial of this cause and the procuring of witnesses.

Counter-affidavits were filed, one by Walsh and the other by John P. Gray, of counsel for the plaintiff. Mr. Walsh swears that the work on the tunnel where the accident occurred has been practically completed, and that the men who have been employed are about to leave and that the plaintiff is without means to retain the witnesses, and if the cause is continued, witnesses to be called by plaintiff will go to other work and he will be deprived of their testimony at the trial. In Mr. Gray's affidavit he swears that the complaint was filed on Dec. 21, 1908, and the defendant appeared on Jan. 22, 1909; that a demurrer was filed and overruled on Jan. 27, 1909; that on March 20th an amended complaint was filed, and on March 30th the motion to strike and a demurrer were filed, and on April 6th an amended demurrer was filed and overruled, and on April 7th the motion to strike was over-

ruled. On April 17th the defendant answered, and on April 21st the cause was set for trial May 31st, and at the time said cause was set for trial George E. Marlowe, of counsel for the defendant, was present in court, and although plaintiff insisted upon an early trial, counsel for defendant objected, and the cause, for convenience of counsel for the defendant, was set for May 31st, and thereafter the cause was continued until June 1st; that when the cause was called for trial on June 1st the defendant presented to affiant an amended answer, and the court asked counsel if they were ready, and the plaintiff announced that he was ready, and the defendant desired a continuance until 2 o'clock to prepare affidavits. This affiant also swears that the witness White for a long time past has been a citizen and resident of Shoshone county, Idaho, and that said White was in Wallace on May 30 and 31 to visit his family, and not to become a witness, and that E. G. Trimper knew White was engaged as a physician in charge of the sick and injured employees along the railroad, and that a subpoena has never been issued for such witness.

Upon the showing thus made the trial court overruled the application for a continuance. The court committed no error. It is the rule in this state that a motion for a continuance is addressed to the sound discretion of the trial court, and his ruling thereon will not be disturbed on appeal unless it appears there has been an abuse thereof. (*Storer v. Heitfeld,* 17 Ida. 113, 105 Pac. 55.) A party is not entitled to a continuance without showing due diligence and the use of legal means to procure the desired evidence. A bare request to furnish the evidence is in no sense a compliance with the requirements of the law. (*Rankin v. Caldwell,* 15 Ida. 625, 99 Pac. 108.) It is apparent from the showing made in this case that after the cause was set for trial the appellant took no steps to ascertain the whereabouts of the witnesses desired, or to procure their testimony. All that is stated in the affidavit may have been true, and yet by the exercise of proper diligence and legal means the evidence of such witnesses could have been procured. The trial court committed no error in overruling the motion for a continuance.

Assignments 2, 3, 4, 5 and 6 relate to the ruling of the court upon objections made to certain questions asked the jurors. An examination of the record, however, does not show that objection was made to any question asked a juror, or that the court was called upon to rule upon any question asked a juror, or that an exception was taken to the ruling of the court on any question asked a juror. The record, therefore, does not support the assignments of error.

Certain questions were asked plaintiff and other witnesses with reference to who had charge of the men in the tunnel and who discharged and employed men and what were the duties of the shift boss; and it is claimed that the court erred in permitting such questions to be asked. In the case of *Larson v. Le Doux*, 11 Ida. 49, 81 Pac. 600, this court quotes and approves the rule announced in sec. 23 of McKinney on Fellow-servants as follows:

''The true test, it is believed, whether an employee occupies the position of a fellow-servant to another employee, or is the representative of his master, is to be found, not from the grade or rank of the offending or injured servant, but it is to be determined by the character of the act being performed by the offending servant by which another employee is injured; or, in other words, whether the person whose status is in question is charged with the performance of a duty which properly belongs to the master.''

Evidence, therefore, which tends to show the respective duties and relations of the alleged principal and his employees as well as their relations to the business generally, and all of the surrounding circumstances, is admissible to aid in determining whether the injured employee sustained such injury by reason of the negligence of a fellow-servant or a vice-principal. (*Lebanon Coal & Min. Assn. v. Zerwick*, 77 Ill. App. 486; White on Personal Injuries in Mines, sec. 294.) Any evidence, therefore, which tended to aid in determining whether the shift boss was a fellow-servant or a vice-principal was admissible.

The accident referred to in this case occurred in the same tunnel as the accident under consideration and involved in

the case of *Maloney v. Winston Bros. Co., ante,* p. 740, 111
Pac. 1080, just decided by this court.   The circumstances sur-
rounding the accident in that case are almost identical with
the circumstances surrounding this case in so far as the re-
lations the appellant and the respondent bear to such accident.
The principles of law laid down and discussed in that care are
directly applicable, and must control this case.   It can serve
no purpose to enter into a detailed discussion of the specific
questions involved in the present case which were passed upon
in that case, as the opinion in that case is affirmed and fol-
lowed.

From the evidence in this case it appears that the respond-
ent was injured in the east end of what is known as the St.
Paul Pass tunnel.   The method of construction as shown by
the evidence was about as follows: A heading was first driven
and was the upper portion of the tunnel.   Two or three hun-
dred feet back of the heading the lower part of the tunnel
was excavated and this was called "the bench."   The rock
removed from the heading was conveyed on cars running on
tracks laid on the top of the bench until such cars came
within a few feet of the end of the bench, when they ran up
an incline to the high line and ran back of the operations at
the end of the bench and were there dumped into the cars
which conveyed the rock out of the tunnel.   The high line
thus referred to was a temporary elevated track laid upon
cross-pieces for the purpose of taking the cars over the heads
of the men who were working at the bench to a short distance
back of them where the cars were dumped.

F. J. McIsaacs, the general superintendent who had charge
of the construction of such tunnel, described the method of
carrying on the work in the tunnel and the distribution of
the workmen and their duties as follows:

"Under me at each end of the tunnel was a general fore-
man, or, as commonly known, a walking boss.   Under the
walking boss were shift bosses, two for the heading and two
for the bench, and sometimes a timber boss in addition.   The
shift boss was a foreman, or a boss, who directly superin-
tended or looked after that portion of the work over which
he had charge, taking his directions from the walking boss.

For the most part there were under the direction of the shift boss five machine men and five helpers, and from fifteen to eighteen muckers and a shovel crew, consisting of an engineer and trainmen on the steam shovel. I am speaking of the bench.

"There would be four machines down on the bottom and one on the top. Immediately following the shot, after the smoke had sufficiently removed so that the shift boss could examine it, he went forward and examined the muck pile; placed his men with a view to bar down that portion of the rock which had not been entirely thrown back or fallen down by the shot. The shovel crew and muckers moved up and the shovel and muckers cleaned off the track, as the rock frequently flew for a considerable distance back; steam shovel was moved ahead and began to clean the muck up and began dumping it into the cars; the machinemen and helpers went on top to bar down the loose material following down the muck as the shovel cleaned it up. So the work was done from the top to a point where there was not enough room for the shovel to get hold of it, and right at the bottom of the bench there was a little which the shovel could not take, and that was shoveled up by the men. All loose material must, of necessity, be removed because the drill can't work against a loose face. The duties of the machinemen were to bar down the loose rock on their portions of the work. There were four machines at the bottom of the bench and one on top. The top crew removed all loose material such as would interfere with the men working on the top. The right-hand machinemen cleaned the right-hand face of the work; the center right-hand crew did the same; the others on the left the same, each crew taking care of that portion of the work where they were supposed to drill. After they had removed all loose rock, the tripods were brought forward and they set up the machine. After the shot had been fired and after the men went into the face of the bench for the purpose of examining the work, the machinemen were supposed to know their duties; they were supposed to bar down the rock at the work they were on. It was not necessary for them to be instructed,

except a new man, who would be told by the shift boss. During the progress of the work, I was there about twice a day and sometimes oftener. No instructions were ever given to a shift boss to discharge any man for barring down loose rock or overhanging or dangerous places, without special instructions from the shift boss. The plan of that work was first for safety. My general instructions to the men were to always make the work safe and look after the men, and progress was a secondary condition. The machinemen and helpers were expected to bar down all loose material without special instructions from anybody. . . . . The machinemen and helpers barred down whatever loose rock they might find from the muck pile, and after the removal of the muck, from ladders. The muck pile or ladders would enable them to reach every portion of the bench and to reach loose rock that might be up there. Ordinarily, the walking boss hired the men—that was one of his duties to see that his crews were filled. There was times when he was not in the tunnel, and the shift boss going on might find himself short, and while it was the general custom for the walking boss to hire all men, it not infrequently happened that the shift boss hired men, but it wasn't the general plan.''

The plaintiff went to work for appellant on the 6th or 7th of March and was injured on the night of the 8th or 9th of March, thus having been in the employ of the appellant at the time of the accident not more than two days; and with reference to the injury he testifies as follows:

''It was our duty to be in there at work about half-past 6, and as I got in there about that time, within a couple of hundred feet of the face of the bench, the day shift was coming out, and they were after blasting a number of holes in the face of the bench. But as they passed out the shift boss goes into the lead and the men follows him in; so we got into the face of the bench, and there was a lot of rock broke loose and the shift boss told us, 'You get on top of the bench and bar it down.' We got on top of the bench—there were eight men, four machinemen and four helpers—two on the right-hand side and two on the left. Me and my partner was

working on the right-hand center, and we picked away there
for about half an hour. The shift boss came to me then and
told me that our place was pretty good, to get down and pick
down the face. So we jumped on the loose part of the rock,
about five feet below, and started to pick down the face. The
two men on the right-hand side picked on top and the shift
boss hollered to them and told them to stop and they stopped.
The shift boss told them to get off the top of the bench, that
they could stay up there picking until they got into the head-
ing—to get down and secure the face. So they got down on
the loose pile of rock, and as the steam shovel was taking up
the loose rock we followed it down to the bottom picking the
face; and as we got within three or four feet of the bottom,
the shift boss told us to get out of the road until the steam
shovel got all the loose rock. We went back of the steam
shovel and stayed there. After we went back of the steam
shovel we waited until the steam shovel had scraped up the
last few shovelsful and they ran the steam shovel close up to
the face of the bench, and they ran it up against the face a
couple of times and told them to shovel it around and get it
into the car; then the shift boss told me and my partner to
go out and get our machines, and we brought in a tripod and
that time the shift boss told us to bring in a small machine.
He said, 'It is so much lighter and handier, and I want you
to drill in a hole or two in the bottom as quick as the devil
will let you.' So we took in the tripod and set it in the right-
hand center, and when we had it in position there, the shift
boss came to me and my partner and told us to move it over
to the right-hand side about three or four feet. At that time
I asked the shift boss if I could go up on top of the bench
and see if there was anything loose up there, and he said,
'That's my business.' He said the rock was solid, if not the
steam shovel would pull it down. . . . . I was not working in
that part of the bench and I did not examine that ground.
So we got the tripod in position there, and we went out and
took in the machine and got the machine on top of the tripod
and the hose connected, and a drill in the piston. Then I
asked the shift boss where he wanted the hole driven, and the

shift boss came over and got at the back end of the machine crank. It was loose on the swing bolt at that time, and he moved it around until he got it into the place where he wanted it, and he told us to tighten it up there and drill in that place. We started in to drill, and we had four or five inches of a hole drilled when the shift boss came to me again and asked me how I was getting along, and I says, 'Not very good; a little .slow.' He said, 'What's the matter?' and I told him there was a lot of water falling down washing loose rock into the hole, and he says, 'Take the drill out and clean the hole, and do it pretty often, and don't let it take you all day to get a hole in.' So my partner took out the drill and I went in to clean the hole out, and I was stooping down when a large mass of rock fell from the top of the bench and hit me on the leg and broke it. At that time the bench was about fifteen feet high and the tunnel twenty-one or twenty-two feet wide. The shift boss wanted us to drill a hole in the side to make room for a mudsill. . . . . After this rock hit me and knocked me down, the men went over to me and stopped the machine and grabbed hold of me and tried to pull me back, and in a few minutes after they done that, another mass of rock fell down, and they looked around a little while until they thought it was safe, and they came up again and grabbed hold of me by the shoulders, and some got shovels and took a big rock off my leg. My right leg was not held. When they got me back, I was lying there about twenty minutes while they went out to the commissary for the stretcher, and I asked the shift boss if he would bring the stretcher in on the motor car, that he could bring it in much faster; that I was getting cold, and the shift boss said he would have it in as soon as he could. I was watching the place all the time where the rock fell from. It looked to me to be about two feet or so from the right hand. It left a gap there about three feet wide. It broke back from the face two or three feet and down the face two or three feet. My leg was buried up in there quite a ways; some large chunks and some broke up; it looked to me like there was a ton of rock there. The place that this rock came from was within

about a foot or two to the place that I was working on, on top of the bench—on the right-hand side of that.''

The evidence of this witness also shows that after the injury he was taken to the hospital, where on the 13th of March his leg was amputated. After the amputation an abscess formed on the left side of the leg and the respondent suffered great pain, and at the time of the trial it had not wholly healed. He was earning at the time of the accident three dollars and seventy-five cents a day, and testified that he had been a miner for the last twenty years and during which time he had not received less than three dollars and fifty cents and sometimes four dollars per day.

There is a conflict in the evidence as to the duties of the shift boss and as to the inspection of the face of the bench from which the rock fell that injured the plaintiff, and also as to the condition of the rock after the blast and before it fell. On the other facts as testified to by the plaintiff and as shown by the evidence of McIsaacs, there is no substantial conflict. To our minds, the evidence clearly shows that at the time the accident occurred the respondent was working and doing the particular act under the specific direction of the shift boss, and that he had no discretion as to the place he was working or as to spending any time or putting forth any effort in ascertaining the character and safety of the surroundings, or in putting such surroundings in a safe condition. This very forcibly appears from a remark made by the shift boss to the respondent just prior to the accident. The plaintiff testifies: ''The shift boss came to me and my partner and told us to move it over the right-hand side three or four feet (referring to the tripod). At that time I asked the shift boss if I could go up on top of the bench and see if there was anything loose up there and he said, 'That is my business.' He said the rock was solid. If not the steam shovel would pull it down. I was not working in that part of the bench and I did not examine that ground.''

There is other evidence which corroborates in effect the evidence of the plaintiff, and when the evidence is considered as a whole, it is clearly sufficient to sustain the verdict of the

jury and clearly establishes that the shift boss was acting for the appellants, was a vice-principal, and that the appellants were negligent in not inspecting and making safe the place where the plaintiff was directed to work by the shift boss, and at which he was engaged in working at the time of the accident. Under the evidence in this case, the plaintiff had a clear right to assume, as said by this court in the Maloney case, "That the shift boss, who was in that case the vice-principal, had examined and inspected the place, and found it to be reasonably safe."

Counsel for appellant claims as error the giving of certain instructions and the refusal to give other instructions asked by the appellant. The instructions thus referred to are practically the same as those discussed in the Maloney case, and we find no prejudicial error in the rulings of the court.

One of the grounds upon which the motion for a new trial is based was misconduct of the jury, and in support of this motion affidavits were filed by four persons, one of whom was of counsel for the appellant, in which it was stated that one of the jurors, Johnson by name, was intoxicated during the trial. The trial judge also certifies that at the opening of court on the fourth day of June, 1909, after the jury had been called, the judge's attention was directed to the fact that one of the jurors was intoxicated, and upon looking at the jury the judge discovered that he was "not sober" and placed him in the custody of the bailiffs to be sobered up, and ordered an adjournment of the case until 2 o'clock in the afternoon; that prior to the opening of court at 2 o'clock in the afternoon the judge saw the juror and he seemed to be perfectly sober, and he was informed by the bailiffs who had charge of such juror that he had not been allowed any intoxicants while in their custody, and that at 2 o'clock the trial was resumed without objection upon the part of either plaintiff or the defendant.

The affidavits of three of the persons filed in support of the motion for a new trial also state that they met the juror Johnson during the afternoon of June 3d in the barroom of a hotel, at which time Johnson expressed his opinion as to the

kind of verdict that should be brought in, and the juror stated that the jury ought to give a big verdict in favor of the plaintiff, and that one Denny was present at the time such conversation took place and was intoxicated and did most of the talking. This conversation and place of meeting is absolutely denied by Johnson. From the record there can be no question but that the juror Johnson was in an intoxicated condition at the opening of court on the morning of June 4th, and it appears that the trial did not proceed at that time on account of such intoxication, and that when the trial was resumed at 2 o'clock of said day the juror was in a sober condition. It appears that the jury were not kept together during the recess of the court, but were permitted to separate, and that after the adjournment of court on June 3d, the juror Johnson was seen in what appeared to be an intoxicated condition, and that this condition had not wholly disappeared, and the juror fully restored to rational consciousness by the elimination of the intoxicating effect on the morning of June 4th when court convened; and it affirmatively appears that the court did not proceed with the trial or receive any evidence or hear any argument, and took no action which called for attention and consideration by the jury during the time the juror was in an intoxicated condition, and that no objection was made by either party to the resumption of the trial or motion made to discharge the panel and to impanel a new jury, or to discharge the particular juror and impanel another juror in his stead.

There is, therefore, nothing in the record which shows that the juror was in a condition which incapacitated him from performing his duties as a juror during the actual progress of the trial, or that the appellant could have in any way been prejudiced by the condition of the juror while court was in session. The conduct of the juror, however, was such as to call for a severe reprimand by the court, which should have been followed by a proper and adequate punishment for indulging in intoxicating liquors during the recess of the court to such an extent that the court was forced to take an adjournment and postpone the trial because of the said juror's

condition. A citizen who has been accepted as a juror should regard the duty thus imposed upon him as of sufficient importance and responsibility that he will conduct himself so as not to be disabled or incapacitated in the discharge of such duty. If this lesson has not been learned, or is not fully appreciated, the court should not overlook the opportunity of so instructing the juror and impressing such fact upon his mind, if necessary, with a liberal and certain punishment, that will have an everlasting effect. And it should be done in such a way that the public generally may be impressed with the lesson thus given and its importance.

The allegations contained in the affidavit as to what the juror said as to the kind of verdict which should be returned are very uncertain, and in view of the circumstances detailed in the affidavits, we are not inclined to interfere with the conclusion of the trial court that the facts thus stated were not sufficient to warrant the granting of a new trial. Trial courts should be very careful to see that jurors properly conduct and deport themselves after having been accepted as jurors, and they should not tolerate or permit any act or indulgence which in any way will incapacitate the juror from performing his duty or deny to the litigants a fair and capable judgment of the jurors.

The amount of the judgment in this case is urged as excessive. The evidence in this case shows that the plaintiff was a man forty-two years of age; that his average earning capacity was three dollars and seventy-five cents per day, and under the rule announced in the Maloney case we are satisfied that the judgment is excessive. The judgment in this case will be affirmed to the extent of $12,000, on condition that the respondent file within thirty days after going down of the *remittitur* a waiver of the excess of $8,000 and an acceptance of the judgment in the sum of $12,000 as thus modified. Upon failure to accept the judgment as thus modified, the judgment will be reversed *in toto* and a new trial granted. *Modified* and *affirmed* accordingly, with costs in favor of the *respondent*.

Sullivan, C. J., and Ailshie, J., concur.

### ON REHEARING.

(December 7, 1910.)

Briefs filed on behalf of Appellant by Edgar Wilson, F. M. Dudley, and A. G. Kerns.

Briefs filed on behalf of Respondent by Gray & Knight, Walter H. Hanson, and John H. Wourms.

AILSHIE, J.—This is a companion case to the case of *Maloney v. Winston Bros. Co., ante,* p. 740, 111 Pac. 1080 just decided. A rehearing was granted in this case for the same reason that a rehearing was had in the Maloney case. The accident here involved occurred in the same tunnel where the injury occurred in the Maloney case. The circumstances under which the accident occurred differ slightly in this case from the other case. The law applicable here, however, is the same as the rule applied in the Maloney case, and upon the authority of that case the judgment in this case as modified on the original hearing will be affirmed.

It can serve no useful purpose for us to again review the evidence in this opinion, as we are satisfied that there was sufficient evidence to justify the jury in concluding that the master was guilty of negligence and that the servant was entitled to recover for the injury sustained.

The judgment will be affirmed to the extent of $12,000, on condition that the respondent file within thirty days after the going down of the *remittitur* a waiver of the excess of $8,000 and an acceptance of the judgment in the sum of $12,000 as thus modified. Upon failure to accept the judgment as modified, it will be reversed *in toto* and a new trial granted. Modified and affirmed accordingly, with costs in favor of the respondent.

Sullivan, C. J., concurs.