(No. 6387. February 3, 1937.)

STATE, Respondent, v. DOUGLAS VAN VLACK,
Appellant.

[65 Pac. (2d) 736.]

E. V. Larson and James F. Ailshie, Jr., for Appellant.

Bert H. Miller, Attorney General, Ariel L. Crowley and John W. Taylor, Assistants Attorney General, for Respondent.

GIVENS, J.— Appellant was convicted of murder in the first degree for the killing of Mildred Van Vlack, nee Hook, who had previously secured an interlocutory decree of divorce from appellant in the state courts at Tacoma, Washington, but which had not ripened into a permanent decree (see the Washington Statutes hereafter cited) and which perhaps never could because of asserted acts of intercourse between appellant and deceased during the interlocutory period hereinafter more fully considered. While appellant does not as strenuously insist that he was not the one who killed deceased, as he does that he was insane if he did, by his plea of not guilty he put such point in issue and questions the sufficiency of the showing in this regard.

The main defense however was insanity, predicated upon his physical and mental condition from birth to the time of the tragedy, and we therefore recite the general history of the case with considerable detail as to the circumstances leading up to the fatal occasion. Not all the witnesses testifying as to his mental condition attaching the same or in some instances any importance to the various incidents outlined.

As detailed by himself, mother and father, relatives, and acquaintances, appellant's version, not without dispute or contradiction, runs in substance thus: Appellant was born July, 1904, after 36 hours of labor on the part of his mother and the use of delivery instruments, after her anaesthetization by chloroform, resulting in appellant's head being severely bruised and deformed, necessitating reshaping thereof by the attending physician. Until 1920 appellant had an apparently normal boyhood, being rather above the average physically and scholastically, with no mental or moral deficiencies.

In 1920 a fall from his bicycle caused him to lose consciousness for several days with claimed mental impairment requiring five years instead of four to complete his high school work. About a year later he received a fall in a Y. M. C. A. gymnasium resulting in unconsciousness, and after this fall he had intermittent headaches, was easily angered, quickly became impatient, was notional, listless, depressed, had periods of despondency and moroseness, alternated by periods of exultation, was intermittent and vacillating in his work; that he secured and undertook different employments, and left home suddenly on one occasion for a trip to the Orient. That prior to his acquaintance with deceased, he had little interest in girls; the fall of 1924 he started to attend Washington State College at Pullman, Washington, and after a few days left saying he did not like the place or the people. That while prior to the accident in the Y. M. C. A. in 1921, he had been quite an able athlete, he thereafter was dropped from a basketball team because he would not cooperate with the other players, and thereafter lost his interest in athletics. He went to California and worked a year and returned to Tacoma, and later returned to another job in California, but avoided seeing an old

chum of his. In 1931 while working for Albers Bros. in Tacoma, he met deceased, about 10 years his junior, and apparently they were immediately mutually attracted to each other. He later lost his job with Albers Bros. because of a misunderstanding about some money, but nevertheless received a recommendation from the manager.

In 1933 deceased's family were going on a vacation trip to Hood's Canal which seemed to perturb appellant greatly because he had contemplated deceased and himself spending their vacation together. Deceased went with her family and appellant later camped near them. During that time appellant and deceased, unknown to the parents of either, went to Shelton, a near-by county seat, and secured a marriage license, apparently with the intention of immediately getting married, but did not do so until two weeks after they got the certificate and after they had returned to Tacoma, when they again went to Shelton and were married. Appellant continuing to live with his parents, and deceased with her parents in adjoining houses. Appellant's mother's suspicions being aroused by indications in the house that they were being together, she accosted him and he admitted being married, and she urged him to have deceased's parents notified, but he said deceased did not wish to have it known at that time. Within a few days however, deceased's parents were told of the marriage, whereupon Mr. Hook lectured appellant for about an hour, and appellant claims he stated (denied by Mr. Hook) "I hate your guts and always will!" and a divorce action was started immediately by deceased, but withdrawn and appellant and deceased moved to their own home, and lived together for about one and a half years, during which time appellant was employed at two different dairies, losing his job at one due to labor trouble, and the other due to his temper, and deceased was employed in a clerical position in the Washington Gas & Electric Co. Appellant complained to his parents that whenever deceased visited her parents she came back dissatisfied with the marriage, indicating that her parents were displeased with the marriage as they had in the first place opposed deceased's going with appellant, and this left appellant morose, despondent and down-hearted.

The young people during the course of their married life accumulated about $800, besides what appellant had previously saved, which was kept in a joint savings account. About late summer of 1935, appellant becoming concerned as to the possible disruption of their marriage, withdrew the entire amount. Thereafter appellant and deceased being at his parents' home, and after repeated inquiries by deceased about the money and a demand that she be given two-thirds of it, appellant informed deceased as to what he had done. He testified she became angry and attacked him and he put her out of the house and locked the door, and while he was dressing, she returned to the house, and the door being locked broke the glass to effect an entrance, cutting her arm, whereupon he let her in and bandaged the wound, and she returned to her home and filed suit for divorce and received an interlocutory decree. (See Remington's Revised Statutes of Washington, vol. 3, secs. 988, 988–1.)

There was also evidence that appellant and deceased were repeatedly together, visiting in a little park in Tacoma, giving witnesses the impression they were lovers; appellant was attempting to prevail upon deceased to abandon the divorce proceedings and appellant asserts that at one time they went to a deserted part of the city and indulged in intercourse, deceased consenting freely thereto. It is contended that thereafter deceased repeatedly called appellant on the phone and on one occasion asked the defendant to come over and see her while her parents were away. Deceased was angry when told by appellant that the act of intercourse would prevent securing the final divorce decree and this in part was the occasion for a quarrel. After some reluctance he went to her house and was met at the door by deceased with a rifle in her hands, pointed at him, and he returned to his parents' home, and later removed his bed from the side of his room next deceased's house in fear of bodily injury, that he did not sleep well, paced the floor and stayed in his room most of the time, that he was out of employment, was discourteous to company at the house, rude and insolent.

In connection with this event, however, the record shows that deceased tried to have appellant arrested for rape, because he had forced her to such intercourse, but prosecution

was abandoned when deceased and her attorney were advised by the prosecutor of the severity of the penalty attached thereto. That deceased thereupon took steps to put appellant under a peace bond which were never consummated. Also that she tried to charge him with larceny of some of her personal effects.

In 1933 appellant borrowed a gun from a friend, Barnard, when he made a trip to California, and a few weeks before November 23, 1935, asked Barnard to loan it to him again. Barnard stating as his reasons for not doing so:

"A. Well, the first thing we talked about was me feeling sorry for he and Mildred breaking up and then, also we started talking about 'in-laws'—the effect that 'in-laws' had upon families sometimes. I told him I was sorry about that. And then he started talking a little more and feeling sorry for himself, and he went on to say that he should have ended it all long ago. I don't know what he meant. He also said he loved Mildred so much that he would kill her before he would let anyone else have her. He also said that if her folks didn't think he was good enough for their daughter, he would like to get her in his car and head for Mexico and make something out of her."

When Barnard went home that same day, he found that appellant had secured the gun from his wife, but never asked appellant for it when he saw him later, and he also denied owing appellant money. Appellant's version of the occurrence was that he had loaned Barnard some money, and had been repaid all but $35. As a pretext for getting the gun to hold as security for this debt, he claims to have told Barnard's wife that he had a roll of money on him that he wanted to protect.

At any event appellant kept the gun, a .380 caliber Remington Automatic pistol, in his possession, and on November 23, 1935, took his automobile and intercepted deceased as she was returning from work, with Doris Clark, her friend, at about 4:30 P. M. on the streets of Tacoma, and there threatened both of them with the gun, urging both by threats and intimidation and argument that deceased go with him in the car and ultimately deceased acquiesced.

Doris Clark who was walking with Mildred, the deceased, testified:

"A. We got off the street car at Mason Street and started down Mason towards the Hook residence. Had covered about one-half block when a dirty, dark colored car came toward us. Mildred hesitated and seemed as if she were about to run, and said, 'Oh, Oh, here comes my boy friend.' I didn't realize what it meant, so I stood there and she stood with me. He turned in front of us, stopping us from going any further, and descended from the car. He spoke to Mildred. We talked for about fifteen minutes, perhaps twenty, and he spoke always as if he were jealous that she had gone out with other men; and he said she had made promises to him and had broken these promises. He had a gun and took it out at three different times; each time he would point it at Mildred, and after we had spoken to him, or perhaps because someone was coming up, he would put the gun away for a short time until he became angry about something, and then he took it out again. His whole idea was to get Mildred.

"GEN. MILLER: Don't state what his idea was.

"A. He told Mildred, that she was to get into the car— that if he couldn't have her no one else was going to. He put the gun in front of her and, looking at his watch, said 'I will give you thirty seconds to get into the car or I will kill you.' Mildred covered the watch and all the time she tried to talk him out of this idea. I tried also. He said he knew what he was doing and that he wanted her to go with him. He pushed Mildred at one time until she fell against the car. If the car had not been there she would have fallen.

. . . . . . . . . . . .

"A. Douglas told me, as he and Mildred got into the car, to go to Mildred's mother and father and tell them that as long as they kept the police away it would be all right, but when the police came, if the police came and followed them, he would kill her. Mildred told me as she left, she gave me her purse and kept only her lip stick, Mildred told me to go and call the Doctor, her family Doctor, because her mother was ill and she was afraid the shock would be too

much. I did as I was told, so I wasted about fifteen minutes until I came to the Hook residence. When I came to the Hook residence I did as Douglas had told me. Douglas, just before he left, before they left, patted me on the shoulder and told me he knew I was a friend of his and would do as he said.''

Appellant testified:

"Q. Now, you say after you stopped the car you told Mildred what you decided to do and tried to get her to go with you and she at first objected?

"A. Yes.

"Q. Do you remember any conversation you had there with Mildred regarding that matter?

"A. I had this gun with me and I told her she would have to go.

. . . . . . . . . . .

"Q. When did you pull the gun?

"A. Well, a short time later.

"Q. After Mildred had objected to going with you?

"A. Yes.

. . . . . . . . . . .

"Q. How long were you there talking to the girls?

"A. Oh, quite some time; it was after 4:30 when she got off the street car, and it was five o'clock when we left there.''

Appellant denies pulling his watch and gun and giving deceased thirty seconds to get into the car, but he took her by the arm and she got in, and he testified he did not threaten to kill her but that he did tell Doris Clark to tell Mr. Hook that if he had the police follow them that he would kill Mildred but that he did this for a bluff.

Appellant and deceased immediately left Tacoma, taking the Pacific Highway, and ate north of Vancouver at a little highway place, got gas and oil at Vancouver. They drove from there to Portland, where Mildred called her uncle from a drugstore, and according to appellant she told him:

"A. She started out and said 'I suppose you have heard what has happened by this time,' and her uncle apparently said he had, and she told her uncle to call her folks up and tell them not to molest us.

"Q. Do you remember just the words she used in that conversation?

"A. Not the exact words, no, but that was the gist of it. She said she was perfectly all right, for them not to worry, and to tell them not to interfere with us or molest us."

They did not eat at Portland, but continued down the Pacific Highway to Eugene, Oregon, where they got gas, and then turned east on the highway that joined the Ontario and Boise highway, driving all night, and had breakfast some place along the highway, and dinner in Ontario, Oregon, about 3 or 4 o'clock that afternoon driving on into Boise where they secured a room at the Idanha Hotel about 6 in the evening and then retired, evidently mutually friendly. In the morning the deceased went out and purchased some toilet articles and returned, and appellant and deceased had breakfast, sent telegrams to their parents and left.

In the meantime her parents had notified the police that she had been kidnaped. The officers in Idaho were notified to keep a watch for them. A traffic officer coming westward from Mountain Home to Boise passed appellant and noticed the license number, and reported it to the sheriff's office, and the information was relayed to Twin Falls, where State Traffic Officer Fontaine Cooper and Deputy-sheriff Henry Givens were dispatched in the traffic officer's car. They passed appellant and turned around and followed him, sounding the siren and stopping appellant about a mile east of Buhl. Deceased having told appellant that if the officers stopped them, to ask them what they wanted, and that she was going with appellant voluntarily. The only testimony as to what took place was given by appellant as follows:

"A. They came up alongside of us and blew their siren, and I stopped and they pulled up in front of me and got out and came back and one of them said,—he stopped about opposite the front of the car about opposite the left hand fender, and the other one came back beside me—said he had orders to take me in, and I asked him what for and he didn't tell me what for—just said, 'Come on and get out of that car,' and I asked him again what he wanted me for, and instead of answering me he reached in and opened the

door and grabbed me by the shoulder and started to pull me out.

"Q. Then what did you do?

"A. Well, I just lost my head at that time and pulled my gun out and shot.

"Q. When you did that what did this officer do that was at the door, if anything?

"A. When I took the gun out of my pocket he dropped his hand away from my shoulder and jumped back.

"Q. What else did he do?

"A. He started reaching under his coat for his gun.

"Q. And which hand did you use in pulling out your gun?

"A. My left hand.

"Q. Are you left handed?

"A. No.

"Q. Then what happened?

"A. Well, I raised the gun, and the officer standing by the front fender was right in line with the gun as I raised it, and I aimed at his right shoulder and shot.

"Q. Did you notice whether or not this officer was making any effort to pull his gun?

"A. He didn't see my gun as quickly as the other officer did; he didn't see it until it got up above the door of the car, and then when he saw it he started to duck; he ducked down to the right.

"Q. And did you see what happened to him?

"A. I didn't see, no; I aimed a shot and he ducked at the same time I shot and then I didn't see him any more. I turned around and looked at the other one.

"Q. Where was he at that time?

"A. Well, he had jumped back, as I said, and started reaching for his gun and I shot at him and didn't think I had hit him.

"Q. Did you notice whether or not he fell or anything?

"A. No, he didn't; I didn't believe I had hit him because it didn't seem to have any effect on him and so I shot a second time.

"Q. Then what happened to him?

"A. That time he dropped down to the ground.

"Q. Then what did you do?

"A. Then I backed the car up and swung out around the men on the ground and drove away.

"Q. What direction did you go, towards Twin Falls?

"A. Towards Twin Falls, yes, sir."

Peace Officer Cooper died immediately and Deputy-sheriff Givens died later.

The only testimony as to what took place on the trip was perforce from appellant because deceased's lips are sealed in death. After the above occurrence, appellant took a side road and at deceased's suggestion he took his license plates off of the car, because they feared they were being followed, and later the car was abandoned by driving it into a ditch to conceal it, but it did not turn over as was planned. According to appellant's story, they wandered around trying to get to Twin Falls, or what they supposed was Twin Falls from the number of lights they saw, and crawled in culverts and under bridges to keep warm, and that appellant and deceased separated so that deceased could return to her parents and appellant could better make his escape, and appellant's mind became a blank until found the next day and taken into custody by the sheriff and taken to Twin Falls. At that time no one knew what had become of deceased, appellant telling the officers that she had gone home and was all right. No word having been heard from her the search continued to November 29th when her body was found about one-third out of and two-thirds in a culvert, 8.76 miles south of Twin Falls, and below a railroad right of way, with a man's tracks near, but not identified as those of appellant.

After deceased's body was found, Walter Beasley a representative of the Associated Press, with the permission of the sheriff of Twin Falls county, who had appellant in custody in the county jail, testified he got the following statements from appellant:

"A. Oh, he walked to the door, and the first thing I did was to look in; I think he was eating at the time, or had just finished, and I looked through the bars, hestitated a moment, and he looked up and I said, 'Hello, Doug., what have you got to say for yourself?' He got up and walked over to the door and says, 'Oh, not much.'

"Q. Is that what he said?

"A. That is what he said. I waited a few seconds, and said, 'It looks like you have yourself in a pretty bad fix.'

"Q. That is what you said?

"A. That is what I said. He said, 'Yes, it looks kind of bad' and I waited a few seconds, and I said, 'I suppose you know they found Mildred this morning?' and he shook his head.

"Q. Affirmatively?

"A. Affirmatively. I waited for perhaps thirty seconds and I said, 'Did you kill her, Doug?' He bowed his head and shook his head affirmatively and said, 'Yes, I killed her.' From then on I don't remember all the details; I went back a ways, and shortly the Sheriff came and took him downstairs. That ended my first conversation with him."

(At a later conversation with him in the cell.)

"A. Very well. I asked him how he killed her. He said 'I shot her.' I asked in what position she was when he shot her. I said, 'Was she standing up?' He said, 'No, she was lying down.' I told him it had been decided she was shot from the front through the eye, the bullet emerging from the back of her head, and I tried to make that clear to him, and he contradicted me and said, 'No, she was shot through the back of the head.' I asked him to explain the circumstances. He told me they had crawled through the culvert and he had pulled weeds and sagebrush up in one end, and the two of them—Mildred and Doug—had crawled through the other end. He said they lay there for a while and he didn't know how long, and it finally got so cold they decided to move on. He got out and turned around and just as she started to come out he leaned over, put the gun against her head and shot her. He said he didn't remember anything after that until the next morning.

"Q. Was anything said as to why he shot her?

"A. I asked him about that, and his first reason was, 'I told her father I would.' I asked him if that was the only reason; I asked him if he figured it was because, in a slang phrase, his goose was cooked, and he couldn't get away, and if he couldn't have her no one else could; he said

no, and I asked him if he was jealous of her and he said no, he had no reason to be.''

Beasley testified that he made no threats, promises, inducements, nor represented himself as an officer to get these statements, and did not have to urge appellant to get the statements.

Apparently because there was some feeling against him in Twin Falls, appellant was taken to Burley for safekeeping, and Chief of Police of Buhl, A. C. Parker, testified on the return trip, appellant made these statements in response to questions asked him:

''A. We discussed the killing of the officers. He admitted to us that he had killed Fontaine Cooper and that he had wounded Henry Givens, not knowing how serious at the time. We led up to the killing of Mildred. Mr. Cryder handed him some pictures and asked him if they reminded him of anything. He stated that one looked like Mildred, or her clothing, but not a very good picture. Mr. Cryder asked him, 'Did you shoot her or knock her in the head first?' He stated, 'I shot her.' Mr. Cryder asked him why he did it. He stated, 'Because I told her folks that if they put the law after us I would kill her, and they knew I would.' Then he explained to us the trip after they had abandoned their car early in the evening, and that they had walked possibly all night—practically all night. They came to a railroad track and a warehouse near the track. They stopped at this warehouse for some time and were getting cold, and Mildred was crying and complaining of being tired out and begged him to go and give himself up. Then I asked him why he didn't allow Mildred to go over to the farm house near the warehouse and he go on by himself when he realized he was trapped. He said, 'Because I told her folks if they put the law after us I would kill her.' He said, 'Then we walked up the track quite a ways and came to a culvert. We got in there to rest, was in there quite a while, and we were getting cold and I knew that daylight would soon come and we would have to get out of there. I crawled out of the culvert and Mildred was still crying and complaining about being all in and tired, and I figured I had a better chance to get away by myself. It was dark, and I just stuck the

gun against her head and shot her. Then I walked up the railroad track quite a ways and figured I had only one chance to get away and that was to get over to the highway where I could see cars going back and forth. I thought perhaps some lone fellow might pick me up and I would force him to take me out of the country.' ''

Parker further testifying that these statements were made freely and voluntarily, without threats, force, persuasion, inducements, or promises of benefit to defendant.

Appellant testified that these statements were secured under fear and duress, claiming that the officers drew up to the side of the road, at the outskirts of town, and told him they would turn appellant over to a group of men who wanted to lynch him if he didn't tell about killing Mildred.

Sheriff Prater also testified to a substantially similar confession made to him while appellant was in jail.

Immediately upon the arrest of appellant for the death of the officers, his father and mother were notified and they came to Twin Falls on November 26th, 1935, and before deceased's body was found, had a conference with E. V. Larson, one of the attorneys herein, regarding retaining him to defend the appellant, but did not definitely employ him, and leaving unexpectedly for Tacoma on Thanksgiving day, left a note with the sheriff's daughter to be delivered to Mr. Larson, advising him of their decision that he act as attorney for appellant. This note was not delivered until about 10 days afterward, when Leo Teats the attorney from Tacoma, secured by appellant's parents, came to Twin Falls and conferred with Mr. Larson.

Two physicians from Twin Falls saw appellant in the county jail the night of his arrest and incarceration and examined him as to his physical and mental condition. The same day he was captured appellant signed a written statement for the county attorney concerning the killing of the officers, but later refused to sign one regarding the killing of deceased.

*In limine* we may say that in spite of the Attorney General's criticism, counsel for appellant should be commended for appending to his requested instructions the citation of authorities in support thereof, as any citation is of

value to the court, but of course, such citation should not accompany the instruction when taken by the jury to its room for consideration. (*State v. Sage*, 22 Ida. 489, 126 Pac. 403, Ann. Cas. 1914B, 251.)

█ The first error assigned is the refusal of the trial court to grant a continuance. Appellant killed the two peace officers, Cooper and Givens, on November 25th. Of that there is no question, he was taken into custody for such killing the morning of November 26th. Deceased's body was found November 29th. A criminal complaint charging appellant with murder in the first degree of deceased was filed in the probate court, December 27th, alleging the offense to have been committed on or about November 26th, 1935. Preliminary hearing was had on the criminal complaint December 28th, and on December 31st, appellant was held to answer in the district court. An information being filed, based on the preliminary charging appellant with murder of deceased, January 13th, 1936. Arraignment was had on January 13th, the 14th being fixed as the day to enter appellant's plea, and on that day a demurrer was filed which was on the same day overruled, and appellant plead "not guilty" and the case was set for January 20th. January 14th, the following affidavit was filed by E. V. Larson, as attorney for appellant, asking for a continuance as appears from said affidavit that appellant and his counsel had anticipated that appellant would be tried for the killing of Fontaine Cooper, that is he would be tried for that offense before the one at bar:

" . . . . That heretofore and on or about the 10th day of December 1935 an action was commenced in the above entitled court by the above named plaintiff charging the defendant with a felony, namely, the crime of murder of the first degree for the killing of one, Fontaine Cooper; that thereafter the defendant entered his plea that he was not guilty, and thereupon the trial of said cause was continued until the January term of the above court; that at the time of said continuance it was indicated that the matter would be set for trial on the 20th day of January 1936 term of said court.

"That the attorneys for the defendant have devoted their time in preparation for the trial of said cause.

"That thereafter and on the 28th day of December 1935, a second complaint was filed in the Probate Court of Twin Falls County, Idaho, charging the defendant with the commission of a felony, namely the crime of murder in the first degree for having killed one Mildred Van Vlack, also known as Mildred Hook, that thereafter and on the 31st day of December 1935, a preliminary hearing was had in said cause in the said Probate Court, after which, the above defendant was, by the Probate Court held to answer to this Court; that thereafter and on the 13th day of January 1936, the January 1936 term of said Court an information was filed by the Prosecuting Attorney of Twin Falls County, charging the defendant with a felony namely the crime of murder of the first degree for having killed one Mildred Van Vlack, also known as Mildred Hook. That it has been brought to the attention of this Affiant, that it is the intention of the plaintiff, the State of Idaho, to have the last mentioned case assigned for trial, before the trial of the defendant on the charge of murder of first degree for having killed one Fontaine Cooper.

"That this affiant, as well as his associate counsel, Leo Teats, of Tacoma, Washington, have directed their efforts in preparing for the defense in the trial of the above named defendant on the charge of murder for the alleged killing of one Fontaine Cooper; that this Affiant and his associate Counsel, Leo Teats, have not had sufficient time in the preparation of the defense of the above named defendant on the charge of murder of the first degree for the alleged killing of one Mildred Van Vlack, also known as Mildred Hook.

"That the defense contemplated on behalf of the defendant on the charge of his having murdered one Fontaine Cooper is an entire, distinct, and different defense, than the one contemplated by this affiant and his associate Counsel on the trial of the defendant on murder of the first degree for the alleged killing of Mildred Van Vlack, also, known as Mildred Hook; that in the preparation of the latter and above cause it will be necessary to interview and procure the attendance of numerous witnesses in and around Tacoma

Washington, that would not be required in the defense of the above named defendant on the charge of murder of the first degree for the alleged killing of Fontaine Cooper; that this affiant has been informed by his associate Leo Teats, that in the trial of the above cause, it is expected to procure documentary evidence material to the defense in said cause from distant parts of the country as far away as the State of New York. That the time will be too short to obtain such documentary evidence in time for the trial of the above cause.''

It will be noticed however, that the affidavit does not state what the evidence was or who the witnesses were they desired or where they lived, etc., except documentary evidence from the state of New York. Counter-affidavits were filed by the county prosecuting attorney stating substantially; that the criminal complaint against appellant for the murder of Mildred Van Vlack, *nee* Hook, was filed on the 27th of December, 1935, and attorney Larson was notified; that upon being asked by attorney Larson which case would be tried first, he informed Mr. Larson that the one charging defendant with the killing of Mildred Van Vlack, and that defendant would be arraigned in the probate court on December 28th, 1935, asking Mr. Larson to be present; that arraignment was held on December 28th, and a preliminary hearing set for December 31st, and held on that date. A second affidavit stated in addition that affiant, the prosecuting attorney, notified the newspapers that defendant would be tried for the killing of Mildred Van Vlack before the trial for killing Officer Cooper, and that Mr. Larson knew of this plan; that affiant spent all of his time preparing for the trial for the murder of Mildred Van Vlack; employing E. M. Sweeley as a ballistic expert, and said Sweeley devoted all of his efforts and investigation to the evidence pertinent to the case brought for the murder of Mildred Van Vlack, and was not prepared to try appellant for the murder of Cooper; that Sweeley was a necessary and material witness for the State in the Cooper case and his evidence necessary to enable the State to go to trial and properly prepare its case, to show Van Vlack fired the shot which killed Cooper; that the evidence given by the ballistic expert was not the same in the two cases; that Mr. Larson made no objection

to trying the Mildred Van Vlack case, until January 14th, and that Mr. Larson could not have been misled, and had ample time to prepare for this case. That affiant suggested to Mr. Larson that the preliminary be set for January 3, 1936, but Mr. Larson wanted it on December 31st, 1935, so as to have more time to prepare for trial; that the State was not ready to try the case for the murder of Fontaine Cooper and could not be ready by the 20th day of January, 1936, and was ready to try the case for the murder of Mildred Van Vlack at that time.

A similar affidavit was filed by the Assistant Attorney General, who assisted in the prosecution of the case.

Section 19–1808, I. C. A., provides that a defendant is entitled to two days to prepare for trial after plea. It appears from the record that Mr. Larson and Mr. Teats were definitely employed to represent appellant on December 4, 23 days prior to the day the complaint was filed in the probate court, 8 days after the alleged commission of the offense, 8 days after the defendant was arrested, and 27 days prior to the day defendant was bound over to the district court. Trial began 47 days after the alleged offense.

Appellant relies strongly on the so-called Scotsborough case, *Powell v. State,* 287 U. S. 45, 53 Sup. Ct. 55, 77 L. ed. 158, 84 A. L. R. 527. The Supreme Court of the United States reversed the state court in the above-entitled matter on the following record: The alleged crime was charged to have been committed on March 25th, and the indictment returned March 31st, 6 days after the alleged offense, herein the criminal complaint was filed 31 days after the alleged offense. In the Scotsborough case the plea and arraignment were had on the same day the indictment was returned and the trial set for April 6th, 12 days after the date of the alleged offense. True herein the case was set for trial January 20th, 7 days after the plea was received on January 13th, but appellant had from December 4th, the day counsel were employed to January 20th, 47 days in which to prepare for trial and we may give full accord to the Scotsborough opinion at page 164:

" . . . . In any event the circumstance lends emphasis to the conclusion that during perhaps the most critical period

of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself . . . . ''

and still it does not show in any way wherein appellant was prejudiced herein by refusal of the continuance. Furthermore, the showing herein was fatally deficient under the repeated holdings of this court because sufficient facts were not set forth in these particulars in compliance with I. C. A., sec. 7–109:

''A motion to postpone a trial on the ground of the absence of evidence can only be made upon affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to procure it. The court may also require the moving party to state, upon affidavit, the evidence which he expects to obtain; and if the adverse party thereupon admit that such evidence would be given, and that it be considered as actually given on the trial, or offered and overruled as improper, the trial must not be postponed.''

Under this section it is proper to refuse a continuance where no showing has been made that legal means were used to procure the witnesses in court. (*Rankin v. Caldwell*, 15 Ida. 625, 99 Pac. 108; *Walsh v. Winston Bros. Co.*, 18 Ida. 768, 111 Pac. 1090.) The showing must comply with this statute. (*Nelson v. Boise Petroleum Corp.*, 54 Ida. 179, 32 Pac. (2d) 782.) Neither did the affidavit comply with I. C. A., section 19–1809, as follows:

''Trial may be postponed for cause.—When an indictment is called for trial, or at any time previous thereto, the court may, upon sufficient cause, direct the trial to be postponed to another day of the same or of the next term.''

On the ground of absence of witnesses, the appellant did not allege herein what he expected to prove by such witnesses; that such evidence was material to his defense; that such evidence is true; that the witness was not absent by his procurement or with his consent; that he had used due diligence

to procure the presence of said witness at the trial, and failed to do so; and that there was reasonable probability that he could and would procure the attendance of said witnesses at the next term of court. (*State v. Corcoran,* 7 Ida. 220, 61 Pac. 1034; *State v. Rooke,* 10 Ida. 388, 79 Pac. 82; *State v. Allen,* 20 Ida. 263, 117 Pac. 849.) A showing of cause in conformity with these statutes must be made. (*State v. Fleming,* 17 Ida. 471, 106 Pac. 305; *State v. McClurg,* 50 Ida. 762, 300 Pac. 898.)

Furthermore the following documents were used by appellant: A certified copy of a complaint in a divorce proceeding from Pierce county, Washington; a certified copy of another complaint in a divorce proceeding from Pierce county, Washington; a certified copy of a criminal complaint for grand larceny filed in Pierce county, Washington; a certified copy of commitment papers of Richard R. Douglas to the State Hospital Commission of the State of New York; a certified copy of commitment papers of Ida G. Spooner to Matteawan State Hospital from the State of New York; and a certified copy of commitment papers of Mary Elizabeth Chapman to the Buffalo State Hospital from the state of New York. The showing on insanity in his family was adduced by these records from New York.

No other witnesses were suggested by him or asked for by him, and no suggestion of surprise or element of unexpected development at the trial. Thus not only does the record not disclose error but affirmatively shows he was given full opportunity to develop and bring before the jury all the evidence he desired. Therefore the court did not abuse its discretion in denying the continuance, *State v. Wetter,* 11 Ida. 433, 83 Pac. 341; *State v. Steers,* 12 Ida. 174 at 181, 85 Pac. 104, and appellant had counsel at the critical time of his defense as demanded in the Scotsborough case, *supra.*

Assignments of error numbered 2, 3, 4, 5, 8, 9, 10, 11, 12, 17, 18, and 20, may be considered together since they all revolve around appellant's contention that statements made by him to Beasley, the Associated Press reporter, Chief of Police Parker, and Sheriff Prater were improperly received and should have been stricken, and that instructions admonishing the jury how confessions should be received

in requested instruction No. 9, advising the jury not to consider the confessions at all should have been given. For the State, these parties testified that the statements made by appellant were free and voluntary, under no threat, duress or coercion.

Appellant attacks the confessions on three factual bases: First, as to Beasley, because of appellant's mental condition, i. e., he did not know what he was saying, and second because while his mother and father tried to get counsel, they had not been retained at the time of the statement, and the statements made to Beasley and the officers on the trip to Burley were made by appellant when he was not represented by counsel, and third, as to the statements made to the officers on the trip, that they were made due to duress, threats and intimidation. The officers denied all such threats, intimidation, and coercion, and appellant's mental and physical condition was testified to fully by himself and Beasley, the sheriff, and the doctors from Twin Falls.

It was primarily for the trial court to determine the admissibility of these confessions, *State v. Nolan*, 31 Ida. 71, 169 Pac. 295; *State v. Jeanoes*, 36 Ida. 810, 213 Pac. 1017; *State v. Andreason*, 44 Ida. 396, 257 Pac. 370; *State v. Dowell*, 47 Ida. 457, 276 Pac. 39, 68 A. L. R. 1061; and it was for the jury to pass upon these statements and the jury's consideration was properly outlined in instruction No. 14 given by the court in accordance with the decisions of this court, *State v. Downing*, 23 Ida. 540, 130 Pac. 461; *State v. Davis*, 6 Ida. 159, 53 Pac. 678; *State v. Wilson*, 51 Ida. 659, 9 Pac. (2d) 497; *State v. Brown*, 53 Ida. 576, 26 Pac. (2d) 131, as follows:

### "INSTRUCTION No. 14.

"The Court will instruct you that if you believe from the evidence that free and voluntary statements and confessions have been made by the defendant in reference to the crime charged in the information, then you may take them into consideration with all the other facts and circumstances proven in the case, and they shall be given such weight as you may think them entitled to receive; but, on the other hand, the Court will further instruct you that, if there was any inducement held out, or threats of violence offered to the

defendant to secure from him a confession, and that he, acting under such inducements or threats of violence of any kind, did make a confession, then the Court will say to you that you should not consider such confession, if any, in arriving at your verdict. For confessions, to be competent for your consideration, must be freely and voluntarily made, and if the confessions, if any, were not freely and voluntarily made by this defendant, then such confession, if any, made by him should not be considered by you.''

Furthermore the motion to strike covered all the testimony of Sheriff Prater and the other two officers, and was obviously too broad because Prater and Parker had been called by appellant as his witnesses and this court has held a motion to strike all the testimony, when some is admissible and some not, though overruled, not the basis for reversal. (*State v. Clark,* 27 Ida. 48, 146 Pac. 1107; *Snook v. Olinger,* 36 Ida. 423, 211 Pac. 559; *Idaho Farm Development Co. v. Brackett,* 44 Ida. 272, 257 Pac. 35; *State v. Jester,* 46 Ida. 561, 270 Pac. 417; 16 C. J. 882, sec. 2209.) Also the requested instructions were correctly refused because they commented on the weight of the evidence, and No. 20 withdrew entirely from the jury these confessions when it was for the jury to determine whether the statements had been made freely and voluntarily and were worthy of consideration or made under compulsion, etc., and therefore to be rejected. (16 C. J. 738, sec. 1518, note 76.) Instruction No. 14, *supra,* covered the matter in requested instruction No. 13 urged in assignment of error No. 20, and requested instruction No. 10, set out in assignment of error No. 18, did not correctly state the law. Absence of counsel did not affect the voluntary nature of these confessions. (16 C. J. 719, sec. 1472.)

Appellant assigns as error that cross-examination of the defendant in regard to the matter of killing the officers was collateral, and therefore inadmissible, citing *Hilbert v. Spokane Int. Ry. Co.,* 20 Ida. 54, 116 Pac. 1116; *Crusoe v. Clark,* 127 Cal. 341, 59 Pac. 700; *State v. Dunn,* 53 Or. 304, 100 Pac. 258.

As indicated above, appellant's principal defense was that of insanity and as the basis of his showing in this regard undertook to have the three physicians called by him com-

prehend as the foundation for their conclusions that he was insane the entire history of his life and all facts and circumstances connected therewith leading up to the killing of deceased, which included the killing of the officers. Appellant's witnesses took the position that there was a change in his mental condition from the time he left Tacoma to the time of the alleged killing of deceased. The State's position was that appellant's mental condition was about the same. Appellant's attorneys tried to show by the right and wrong test that he was not legally responsible for the killing. It was therefore pertinent for the State to show the continuous and stated conditions of his mind, the State taking the position there was no change during the whole trip, appellant otherwise.

The questions asked were:

"Q. Now, I will ask you if it isn't a fact that at that time and place, this question was asked and answered, as follows: 'Did you realize, at the time you took your wife and forced her to go with you there at Tacoma, that you were violating the kidnapping law of the State of Washington and the United States?' to which you answered, 'Yes.'

"Mr. TEATS: That being a gross mis-statement of the law and misrepresentation, we move that the question and answer be stricken. It is impeaching him upon a collateral issue, and is immaterial.

"The COURT: He may answer.

"Q. Was that your answer to that question?

"A. I presume so.

"Q. Would you say it was not?

"A. No, I wouldn't.

"Q. I will ask you if this question was not asked you at that time and place, 'And you realized what the punishment for that particular crime is in that State?' to which you answered, 'Yes.'

"Mr. TEATS: The same objection.

"The COURT: The same ruling.

"Q. Was that your answer to that question?

"A. I suppose so.

"Q. I will ask you if the question was not propounded to you and the following answer made at that time and place:

'What is it?' and you answered, 'The same as it is for killing a person.'

"Mr. TEATS: The same objection.

"The COURT: The same ruling.

"Q. Did you make that answer to that question?

"A. Yes.

"Q. I will ask you if this question was not asked you, to which you made the following reply: 'Then, when you saw the officers approach you knew you were guilty of a crime, and in order to avoid arrest you opened fire?' to which you answered 'Yes.'

"Mr. TEATS: The same objection.

"The COURT: The same ruling.

"A. I suppose so.

"Q. I will ask you if this question was not asked you at that time, to which you made the following answer: 'Because you were already guilty of one crime, and by shooting these officers thought it would afford you a means of escape?' is that correct? to which you answered, 'Yes.'

"Mr. TEATS: The same objection.

"The COURT: The same ruling.

"Q. Did you make that answer to that question?

"A. Possibly; I don't remember. I answered all the questions he asked me just like he wanted me to. I was so hungry and tired I didn't give a darn about anything at that time.

"Q. Did you tell Mr. Babcock you were hungry and tired?

"A. I told the Sheriff numerous times.

"Q. Did you tell Mr. Babcock?

"A. No, I didn't.

"Q. Now, I will ask you if this question and answer was not propounded to you, and answered at that time: 'Question. But you were carrying a gun for an emergency, if you were, is that correct?' to which you answered, 'I carried the gun mainly to intimidate my wife with, in the first place.' Did you make that answer to that question?

"A. I suppose so.

"Q. And I will ask you if this question—

"Mr. LARSON: May we have the same objection to all this line of testimony?

"The COURT: You may if you desire.

"Mr. LARSON: We do so desire.

"The COURT: Let the record so show.

"Q. (Con.) 'You were also carrying it for the purpose of keeping your wife from leaving you, to intimidate her?' Answer: 'If it was necessary.' Did you make that answer to that question?

"A. Possibly.

"Q. Would you say you didn't?

"A. I don't know, I can't read what you have got there and I can't remember what I said.

"Q. Well look at it.

"A. All right. (General Miller hands document to witness.)

"Q. Does that assist you any?

"A. I presume that is correct."

The matter was thus not collateral as it had a direct bearing on appellant's condition of mind. (*State v. Bush*, 50 Ida. 166, 295 Pac. 432; *State v. Farmer*, 34 Ida. 370, 201 Pac. 33; *Hilbert v. Spokane Int. Ry. Co.*, *supra; State v. Crea*, 10 Ida. 88, 76 Pac. 1013; *State v. Irwin*, 9 Ida. 35, 71 Pac. 608, 60 L. R. A. 716.)

 Assignment of error No. 7 is predicated upon this incident in the record:

"Q. You think because he didn't size up the Hook family right, and didn't predict correctly in advance what they would do, he must be crazy on that account?

"A. No. A chair can't stand on one leg, and you cannot work a Chinese puzzle unless you have all the pieces.

"Q. You mention a Chinese puzzle whenever you are embarrassed—

"Mr. TEATS: We move the remark of counsel be stricken.

"The COURT: Proceed."

Appellant urging that:

"There could be but one purpose for such a remark on the part of counsel which would be to belittle the defendant and hold him up for ridicule before the jury, and such remark was highly prejudicial to the defendant and should have been stricken by the Court upon the request of defendant."

The purpose of all cross-examination is to weaken or show the untruthfulness of the testimony of the party examined

or the party's bias or prejudice. The remark did not belittle the defendant, or tend that way, it might belittle the witness, but the trial court must perforce have a large discretion in such matters, and counsel must necessarily have some latitude in the trial of a case, and while counsel for the State should keep within proper bounds, we cannot say the court abused his discretion here or that any prejudice resulted from the colloquy, or that it was improper in view of the previous testimony of the witness:

"Q. Then, if a man kills somebody, an atrocious murder, then you have to go back to see if his grandfather was crazy before you can tell he was insane?

"A. No, you don't have to do that; you take the family history and all those things into consideration; and I tried to give an example by saying that you can't work a Chinese puzzle unless we have all the pieces; and unless we get all the pieces we can't determine those things. There are many cases undetermined as far as insanity is concerned."

 Assignment of error No. 13, urged that requested instruction No. 1 should have been given as follows:

"The laws of the State of Idaho define first degree murder as the willful, deliberate and premeditated killing of a human being with malice aforethought. You are instructed that all of these essentials are necessary to constitute first degree murder. The terms 'deliberate' and 'premeditated' are not synonymous. As these terms are used, premeditation consists of the entertaining by the mind of a design to kill prior to the killing, and deliberation means the weighing of the considerations for and against the killing, or the determination of whether or not the contemplated killing should be done. Deliberation requires a cool state of blood and the absence of sudden passion caused by lawful or just provocation. You are instructed that one in the heat of passion may premeditate without deliberating. One may kill another purposely without deliberating or premeditating the killing. (29 C. J. 1112.)"

It was properly refused because there was no testimony of heat of passion, cold blood, or lawful or just or any provocation in the case at bar and the court sufficiently covered the question of premeditation in instruction No. 12 as follows:

"A killing is willful when it is intentional and not accidental; it is deliberate whenever the intent or purpose to take life is formed upon deliberation or consideration; it is premeditated whenever deliberation or consideration, however short, precedes the execution of the purpose formed; it is felonious when it is unlawful."

Likewise requested instruction No. 13 in assignment of error No. 20 as follows:

"The Court instructs the jury that no confession is deemed to be voluntary if it appears to the jury to have been caused by an inducement, threat or promise proceeding from a person in authority, and having reference to the charge against the accused person, whether addressed to him directly or brought to his knowledge indirectly, and if such inducement, threat or promise gave the accused person reasonable grounds for supposing that by making a confession or admission he would gain some advantage or avoid some evil in reference to the proceedings against him. The prosecutor, officers of justice having the prisoner in custody, or magistrate are persons in authority. It is time for the jury to determine for themselves whether the alleged confession of the defendant was made freely and voluntarily without any influence of hope or fear. If so, they may consider it. If not, it is no evidence. Any—the slightest—menace or threat, or any hope engendered or encouraged that the prisoner's case will be lightened or more favorably dealt with if he will confess, is enough to exclude the confession thereby superinduced; and any words spoken in the hearing of the prisoner which may, in their nature, engender such fear or hope, render it necessary that a confession made within a reasonable time afterwards shall be excluded, unless it is shown by clear and full proof that the confession was voluntarily made after all trace of hope or fear had been fully withdrawn or explained away. (Brickwood Sackett Instructions, vol. 2, sec. 2526.)"
was covered by instruction No. 14 given, *supra,* and comments on the weight of the evidence.

Requested instruction No. 15, in assignment of error No. 22 as follows:

"You are instructed that, while the law presumes all men to be sane, yet this presumption may be overcome by evi-

dence tending to prove insanity existed at the time of the commission of the alleged offense. When such evidence is introduced, then the presumption of sanity ceases, and the prosecution is bound to prove the sanity of the accused beyond a reasonable doubt. So in this case where the defense of insanity is interposed, if the jury after considering all the evidence entertain a reasonable doubt of the insanity of the defendant at the time of the alleged offense, then he must be acquitted. (Brickwood Sackett Instructions, sec. 2595 (a) ; *Jamison v. People,* 145 Ill. 357, 34 N. E. 486; *State v. Shuff,* 9 Ida. 115, 130, 131, 72 Pac. 664, and cases cited.)''

was covered by instruction No. 18 given, as follows:

''The law presumes that all men are sane and responsible for their acts. In this case the defendant has interposed the defense of insanity. The law does not place upon him the burden of proving beyond a reasonable doubt that he was insane at the time the act charged was committed, but only places the burden upon him to raise in your minds a reasonable doubt as to his sanity. If there is in your mind a reasonable doubt as to the sanity of the defendant at the time of the commission of the act alleged in the information, then this reasonable doubt must be resolved in his favor and you must acquit him of the crime charged.''

Appellant requested instruction No. 2 by assignment of error No. 14, as follows:

''You are further instructed that you are the sole and exclusive judges of the weight and credibility to be allowed the testimony of the several witnesses, both for the State and for the defendant.

''In weighing the testimony of the various witnesses, it is your duty to determine whose testimony is most worthy of belief from the appearance and demeanor of the witnesses; their manner of testifying; their apparent frankness or lack of frankness; their bias or prejudice for or against the defendant, if any is shown; their apparent intelligence or lack of it; their interest in the result of the case, if any; their respective opportunities to become acquainted with the fact and all their surrounding circumstances, and give credit accordingly.

"You are further instructed that if you believe that any witness who has testified in this case, whether for the State or for the defendant, has knowingly sworn falsely as to any *manner* or circumstance material to the issues in this case, then you are at liberty to disregard the entire testimony of such witness, except insofar as it is corroborated by the testimony of another deemed by you worthy of belief or by the facts and circumstances proven on the trial.

"These rules apply to any testimony given by the defendant as a witness as well as to the testimony of others."
and argues that:

" . . . . The Court, however, did not fully cover the points in the defendant's requested instruction, such as, that the jury are the sole and exclusive judges of the weight and credibility to be allowed to the testimony of witnesses, that they should judge as to the credibility and appearance of the witnesses; their manner of testifying and apparent frankness, or lack of frankness; their bias or prejudice for or against the defendant, if any is shown, their apparent intelligence or lack of it; their interest in the result of the case, if any; their respective opportunities to become acquainted with the facts and all the surrounding circumstances and give credit accordingly."

It is difficult to see how appellant could make this complaint because the court gave instruction No. 22 which is practically in the same language requested, and amplified by instruction No. 23:

"INSTRUCTION No. 22.

"The Court instructs the jury that in this case you accept the law as given you by the Court, but you are the exclusive judges of the facts, and the credibility of the witnesses and the weight to be given to their testimony. If there is real or apparent conflict in the evidence it is your duty to reconcile that conflict so that all may stand if it can be done; that is, it is your province to determine what you will accept as true and what you will reject as false. In determining the weight you will give to the testimony of a witness you may consider all of his evidence, whether it be sustained or unsustained, reasonable or unreasonable, whether it is corroborated by other credible evidence, the knowledge which

the witness had of the facts about which he testified, the intelligence of the witness, whether or not the witness has been impeached, his opportunities for knowing or recollecting the facts about which he testified, his manner upon the stand, any bias or prejudice which he may have exhibited towards or against the plaintiff or the defendant, his interest, if any, in this case, and any and all other facts and circumstances in evidence which, in your minds, go to increase or diminish the weight of such evidence.''

"INSTRUCTION No. 23.

"You are instructed, gentlemen of the jury, that if you believe from the evidence in this case that any witness has wilfully and knowingly testified falsely to any material point in the case, you have the right to reject the entire testimony of such witness except where his testimony is corroborated by other witnesses whom you believe to be credible or by circumstances appearing in evidence.''

Appellant's requested instruction No. 7, urged in assignment of error No. 16:

"When the felonious killing of one human being by another is proven beyond a reasonable doubt, the law presumes that such killing constitutes murder in the second degree. If the state would elevate it to murder in the first degree, it must prove beyond reasonable doubt that such killing was premeditated. (*State v. Gruber*, 150 Wash. 66, 272 Pac. 89.)''

was sufficiently covered by instructions Nos. 4, 5, 6, 7, 12, and subdivision 4 of No. 13 as follows:

"INSTRUCTION No. 4.

"In this case the burden is upon the plaintiff to prove the guilt of the defendant beyond a reasonable doubt, and before you can convict him of the crime charged against him by the information you should require the prosecution to prove every material allegation contained in the information beyond a reasonable doubt; and if, after a consideration of all the evidence in the case you entertain a reasonable doubt of the truth of any one of these material allegations it then is your duty to give the defendant the benefit of that doubt and acquit him.''

"INSTRUCTION No. 5.

"A reasonable doubt, as used in these instructions, is such a doubt as a reasonable and prudent man would be likely to act upon in determining the important affairs of life. A doubt produced by undue sensibility in the mind of a juror in view of the consequences of his verdict is not a reasonable doubt; and the jury is not allowed to create sources or materials of doubt by remote conjectures as to possible states of the case different from those established by the evidence. You are not at liberty to disbelieve as jurors if from the evidence you believe as men. The oath which you have each taken imposes upon you no obligation to doubt when no doubt would exist if no oath had been administered, and in considering this case the jury are not to go beyond the evidence to hunt for doubt, nor must they entertain such doubts as are merely chimerical or conjectural. A doubt to justify an acquittal must be reasonable, and must arise from a candid and impartial consideration of all evidence in the case. If, after considering all the evidence, you can say that you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt."

"INSTRUCTION No. 6.

"By the averments of the information the defendant is charged with the crime of murder, which includes not only murder of the first degree but also murder of the second degree and manslaughter, both voluntary and involuntary.

"When a crime is by statute differentiated into degrees, it is the duty of the jury to determine by their verdict what degree, thereof, if any, has been committed."

"INSTRUCTION No. 7.

"By the averments of this information, gentlemen of the jury, the defendant is charged with the crime of murder of the first degree, murder of the second degree, and manslaughter, both voluntary and involuntary.

"Section 17–1101 of the Idaho Code Annotated defines 'murder' as follows:

" 'Murder is the unlawful killing of a human being with malice aforethought.'

"Section 17–1102 of said Code, defining 'Malice aforethought' says:

" 'Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.'

"Section 17–1103, Idaho Code Annotated, as amended by Section 1, Chapter 24, Idaho Session Laws 1935, at page 41, defining the degrees of murder, reads as follows:

" 'All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate arson, rape, robbery, burglary, kidnaping or mayhem, is murder of the first degree. All other kinds of murder are of the second degree.'

"Section 17–1106 defines 'manslaughter' as follows:

" 'Manslaughter is the unlawful killing of a human being, without malice. It is of two kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion;

"2. Involuntary—in the perpetration of or attempt to perpetrate any unlawful act, other than arson, rape, robbery, burglary, or mayhem; or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection.' "

"INSTRUCTION No. 12.

" (Quoted *supra*.)

"INSTRUCTION No. 13.

"Before you can find the defendant guilty of murder of the first degree, you must find from the evidence, beyond a reasonable doubt;

. . . . . . . . . . . . .

"4. That the said defendant wilfully, deliberately, premeditatedly, unlawfully and with malice aforethought inflicted the wounds from which the deceased died."

And these instructions given, also cover requested instruction No. 21, urged in assignment of error No. 25:

"You are instructed that the law provides that in the event an accused shall be deemed proven beyond a reasonable doubt to be guilty of some degree of a crime, but a reasonable

doubt shall exist as to what degree of crime such one is guilty of, that there shall be a conviction only of the lesser degree of crime.

"In determining what your verdict shall be you will, if you find the defendant guilty and shall have such reasonable doubt as to what degree of crime he is guilty of, give him the benefit of this doubt."

 Assignment of error No. 19, urges that requested instruction No. 11, as follows: should have been given: ·

"The jury are instructed that they cannot convict defendant alone upon his own confession, unless the same is corroborated by other evidence tending to connect defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of an offense." citing Brickwood-Sackett Instructions, vol. 2, sec. 2523, which in turn relies upon *Cox v. State*, (Tex. Cr. App.) 69 S. W. 145, a Texas case, which upon a careful analysis, while it approved the instruction requested, that is, held it was sufficient, not that it would have been error to refuse to give it because the court there said: *"Appellant's identity as the criminal may rest alone upon his uncorroborated confession"* (italics ours), and herein the proof of the fact that the deceased was dead and had been killed was proved absolutely and beyond peradventure of a doubt, *aliunde* the confessions or admissions or statements of the defendant, and this court as early as Fifth Idaho considering the sufficiency of confessions in a first degree murder case stated:

" . . . . Then there is other evidence than his confession which in our opinion, would justify the verdict of the jury, and which points with certainty to the guilt of the defendant." (*State v. Smith*, 5 Ida. 291, 48 Pac. 1060.)

Furthermore, *Cox v. State, supra,* has been somewhat modified in a later decision of the same court, *Ingram v. State,* 78 Tex. Cr. Rep. 559, 182 S. W. 290 at 303, holding that confessions may be used to aid even the proof of the *corpus delicti* not alone the connection of the defendant with the crime. The requested instruction was furthermore clearly erroneous in this: that it went beyond the law as heretofore laid down by this court as to what evidence, in addition to the confessions of the defendant, is necessary to sustain a

conviction and did not state that *slight corroborating facts* are sufficient, which has clearly been the rule in this State since 1902 as appears from the following quotation, cited with approval on this same proposition in *State v. Wilson,* 51 Ida. 659, at 669, 9 Pac. (2d) 497.

" . . . . It is also a well-recognized rule that the fact that a crime has been committed cannot be proved by the extra-judicial confessions or statements of the prisoner, and that there must be some evidence or corroborating circumstances tending to show that a crime has been committed, aside from such confessions or statements. (*People v. Jones,* 31 Cal. 565, 566; Wharton's Criminal Evidence, 9th ed., secs. 632, 633.) In *People v. Badgley,* 16 Wend. (N. Y.) 53, it is said: 'Full proof of the body of the crime—the *corpus delicti*—independently of the confessions, is not required by any of the cases; *and in many of them slight corroborating facts were held sufficient.'*" (Italics ours.) (*State v. Keller,* 8 Ida. 699, 70 Pac. 1051. And see *State v. Downing,* 23 Ida. 540 at 544, 130 Pac. 461.)

This distinction is pointed out in *Sullivan v. State,* 40 Tex. Cr. Rep. 633, 639, 51 S. W. 375, as follows:

"It is well settled that the confession of the accused alone will not justify a conviction. This question has been frequently decided by various decisions of this state; but, so far as we are aware, it is settled that the death of the deceased being shown to have been brought about by the criminal agency or procurement of some one, the confession is sufficient to connect the party making the confession with the crime."

Appellant has cited no authorities that have held it prejudicial error to refuse an instruction such as was requested, under evidence such as appears in this case. The authorities relied upon by defendant state that confessions of the defendant are sufficient to connect him with the crime, which point the requested instruction did not cover, and this court has held that it is not error to refuse a requested instruction which though partly right is likewise partly erroneous. (*State v. Boykin,* 40 Ida. 536, 234 Pac. 157; *State v. Farnsworth,* 51 Ida. 768, 10 Pac. (2d) 295.)

██ By assignment of error No. 21, appellant contends that there was a conflict between instruction No. 19 and No. 20, given:

"INSTRUCTION No. 19.

"Insanity is a disease which prevents a person from understanding the nature of the act in question and its possible consequences, or, which renders him incapable of resisting the temptation to commit a crime even though he knows that he is doing wrong."

"INSTRUCTION No. 20.

"Should you be convinced beyond a reasonable doubt that the defendant inflicted the fatal wound, then the Court instructs you, gentlemen, that the true test and standard of accountability is: Has the defendant sufficient mental capacity to appreciate the character and quality of his acts? Did he know and understand that it was in violation of the rights of another and in itself wrong? Did he know that it was prohibited by the laws of the State and that its commission would entail punishment and penalty upon himself? If he had the capacity thus to appreciate the character and comprehend the possible or probable consequences of his acts, he is responsible to the law for the acts thus committed and is to be judged accordingly. A person in the possession of a sound mind who commits a criminal act under the impulse of passion or revenge, which may temporarily dethrone reason, or for the time being control his will, cannot be shielded from the consequences of his act."

There was no conflict because the one states that insanity is a defense, and the next one more than favorably to the defendant lays down the standard of how the jury would determine whether appellant was insane. (*State v. Gould,* 55 Ida. 588, 44 Pac. (2d) 1114; *State v. Fleming,* 17 Ida. 471, 106 Pac. 305; *Flanders v. State,* 24 Wyo. 81, 156 Pac. 39, 1121; *Parsons v. State,* 81 Ala. 577, 2 So. 854, 60 Am. Rep. 193; *Bell v. State,* 120 Ark. 530, 180 S. W. 186; *Harris v. State,* 155 Ga. 405, 117 S. E. 460.)

██ Appellant's requested instruction No. 17 is the basis of assignment of error No. 23:

"The Court instructs the jury that temporary insanity at the time of a commission of a crime is as fully recognized by

law as a defense to crime as a permanent insanity and should the jury believe from the evidence that the defendant, at the time of the event in question, was suffering from temporary insanity, such fact would be a defense in this action even though the defendant has now regained his normal mind.''
but was substantially covered by instructions Nos. 18, 19, and 20 given, and quoted, *supra*.

Requested instruction No. 23:

''You are instructed that the information filed herein is merely the method provided by law whereby the State of Idaho, on behalf of its people shall accuse one of a violation of the law and whereby the one accused shall be advised of the accusation against him that he may defend against it. The fact of the information having been filed gives rise to no inference that the accused is guilty.

''These instructions are merely the method provided by law whereby the court shall advise you of the law applicable to the case and which must guide you in the consideration of the evidence and in the determination of what your verdict shall be. It is your duty to accept such finally as correct statements of the applicable law and this notwithstanding any statements otherwise by any attorney in argument or during the course of the trial and despite any opinion of your own that the law is different, or ought to be different, than as set forth herein.''
set forth in assignment of error No. 26, was covered by instructions No. 2 and No. 25:

''INSTRUCTION No. 2.

''The Court instructs the jury that the information in this case is a mere formal charge for the purpose of putting the defendant on trial and constitutes no evidence of his guilt, and no juror should permit himself to weigh it as any evidence against the defendant.''

''INSTRUCTION No. 25.

''The court has heard it suggested that jurors sometimes scrutinize instructions of the court with a view of ascertaining therefrom the personal opinion of the court upon the merits of the case. The court has no power to charge you upon the facts or either directly or indirectly, indicate to you its view upon the merits. It is the duty of the court to

charge you upon the law only, and as jurors sworn to try the cause upon the law and the evidence you have no right to assume that the court has any views as to the verdict that should be arrived at as the result of your deliberations in this case, and you must enter upon your deliberations with the understanding that the court has no opinion or idea as to what your verdict should be.

"The jury should not consider or in any way or to any extent be influenced or controlled by the remarks or statements of the court in replying to questions or in replying to statements of counsel on either side, or by any remarks or statements of the court in ruling upon the admissibility of evidence or to evidence offered but not received or evidence ordered stricken from the record by the court. Your verdict should be based upon the evidence submitted at the trial and the instructions of the court applicable thereto and upon nothing else."

Requested instruction No. 24, in assignment of error No. 27 was incorrect:

"You are instructed as to the determination of whether the defendant shall suffer punishment by death in case you shall find him guilty of murder in the first degree. You must form that determination upon all the evidence in the case and all the circumstances developed during the trial before you that bear thereon. In this, as in the determination of all other questions submitted to you, bias, prejudice, hostility and resentment have no place. Nor does sympathy nor sentiment. It is a plain question of fact whether the defendant deserves to suffer death as a punishment in case he is thus found guilty of murder in the first degree, when the nature of the crime, the presence or absence of motive for its commission, the presence or absence of provocation by act or word on the part of the person killed, the age of the defendant, the life history of the defendant as you may find it to be from the evidence, and all the facts established in the case are weighed and considered by you in the light of your duties as jurors, charged by law with the determination of this question.

"In this connection you are instructed that you are in no wise concerned with what penalty under the law may be im-

posed by the court, if your verdict be that the defendant if he be found guilty of murder in the first degree shall not suffer death as a punishment, or with what any penalty under the law may be upon defendant being convicted of any other offense under these instructions. In these latter circumstances the determination of the penalty is for the court alone, subject to the limitation of the law.''

The statute provides that if the jury find the defendant guilty of murder in the first degree they may fix the penalty which may be death or life imprisonment, which was set forth in instruction No. 9. The latter half of the requested instruction was covered. As to the first part, it is contradictory because in the first place it says that the jury shall take into consideration all circumstances shown by the trial, and then that there should be no consideration of certain elements, some of which however the jury should have properly considered and others not, but by the requested instruction all would have been excluded. The court can do no more than inform the jury of its province, it cannot direct or advise the jury as to what should control them upon the question of discretion. (30 C. J. 425, sec. 670, n. 87; 2 Michie, Homicide, p. 1738, sec. 311; Wharton on Homicide, p. 1056, sec. 660, n. 16; *State v. Martin,* 92 N. J. L. 436, 106 Atl. 385, 17 A. L. R. 1090.)

Appellant calls attention to the examination of the jurors as showing prejudice. No change of venue was asked for, and appellant used only six peremptory challenges, having four left, and no challenge for cause was made or denied. The record shows:

''The COURT: The defendant's seventh peremptory challenge.

''Mr. TEATS: If your Honor please, we are satisfied with the jury.''

Thus the jury was in every way of his choosing and no error can now be urged in connection therewith. (*State v. McMahon,* 37 Ida. 737, 219 Pac. 603; and see *State v. Fondren,* 24 Ida. 663, 135 Pac. 265.)

Conceding that the jury might have found the defendant insane and therefore not to be held liable for killing deceased, the jury did not do so and the evidence, as indicated above

is such that we cannot say the jury abused its discretion in prescribing death as the penalty.

Requested instruction No. 26, in assignment of error No. 29 singled out the defendant as a witness contrary to the decisions of this court and was properly refused. (*State v. Orr,* 53 Ida. 452, 24 Pac. (2d) 679; *State v. Foyte,* 43 Ida. 459, 252 Pac. 673; *State v. Lundhigh,* 30 Ida. 365, 164 Pac. 690; *State v. Rogers,* 30 Ida. 259, 163 Pac. 912.)

By assignment of error No. 30, appellant assigns as error the refusal of the trial court to give requested instruction No. 27 which was as follows:

''You are instructed, that the mental unsoundness of the defendant, if any you find, though not so pronounced as to entitle the defendant to an acquittal by reason of insanity, may, nevertheless, be considered by you for the purpose of determining whether or not, the defendant committed the act with the intent necessary to constitute murder in the first degree. As you are instructed elsewhere in these instructions in order to find the defendant guilty of murder in the first degree you must find that he acted with premeditation and deliberation in the commission of the act charged to him in the information, in this connection you are instructed that you should take into consideration any mental disorders that you may find the defendant had, if any, and whether the defendant was too disordered in his mind to be capable of a premeditated and deliberate killing. If he was so incapable, he cannot be convicted of murder in the first degree, but only of murder in the second degree.''
urging that the defense of partial insanity to reduce the grade of the offense should have thereby been presented to the jury on the theory and contention that persons may be not sufficiently insane to avoid all legal responsibility for their acts and yet be so far disabled in their mind as to be incapable of entertaining some particular essential mental state, in the immediate instance, premeditation and deliberation, and therefore guilty of a lesser offense.

The instruction requested is taken *verbatim* from Weihofen's Insanity as a Defense in Criminal Law, page 101. This text first discusses the common-law tests for insanity or mental ability in connection with one's responsibility for one's

acts, and concludes with regard to the generally accepted common law or classical right and wrong, appreciation of the moral consequences and wrongfulness of the act test that the right and wrong test now exists in New Jersey, Georgia, North Carolina, Illinois, California, Idaho, Tennessee, New York, Nebraska, Mississippi, Missouri, Arkansas, Kansas, Oregon, South Carolina, Maryland, Utah, Minnesota, Nevada, South Dakota, New Mexico, West Virginia, Texas, Maine, Florida, North Dakota, Washington, Wisconsin, Wyoming, Arizona, Iowa, and Pennsylvania. That the following states have adopted some other test by subsequent cases, Illinois, Arkansas, Utah, New Mexico, and Washington, and at page 101 and attendant pages discusses the rule contended for by appellant, an analysis thereof indicating the test suggested must be in addition to the right and wrong test. Additional for this reason: Malice aforethought was the essential ingredient of murder at common law, deliberation and premeditation have been added by our statute and statutes of many other states as a prerequisite to murder in the first degree. The right and wrong test has been universally applied, not only in this state but others as a test of accountability of murder in the first degree, and the instruction herein requested must perforce recognize that the right and wrong test was sufficient to lead to the conclusion that the defendant had sufficient mental ability to have and possess the mental condition of malice aforethought as that is the essential ingredient of murder in the second degree, and malice aforethought, express or implied, is a mental condition. (29 C. J. 1089, sec. 63, n. 77; *Craft v. State,* 3 Kan. 450 at 486; *Darry v. People,* 10 N. Y. 120, 136, 2 Park Cr. 606; *People v. Scalisi,* 324 Ill. 131, 154 N. E. 715; Wharton, Homicide, 3d ed., secs. 81–84, pp. 96–105; Wharton, Criminal Law, chap. IV, 12th ed., secs. 137–161, pp. 190–217.)

If therefore a person under the right and wrong test possesses sufficient ability to entertain malice aforethought, the authorities relied upon by the text and by appellant to sustain the instruction must be based upon two propositions. First, that one must possess greater mentality to deliberate and premeditate than to possess malice aforethought, and second, there must be some standard or test of determining

whether the individual possesses such added mental ability. It is therefore not a question of partial insanity but of mental ability. Under the instructions as given by the court, the definitions of murder in the first and second degree were given, and in which it was clearly stated that defendant could not be guilty of murder in the first degree unless capable of premeditation and deliberation.

The requested instruction, if given, would have compelled the jury to find the defendant guilty of murder in the second degree even though he had not sufficient mentality to have malice aforethought. *State v. Saxon,* 87 Conn. 5, 86 Atl. 590 at 594:

" . . . . The language of the request, except the direction to the jury as to the verdict which should be rendered, was apparently taken from the opinion of the court in *Anderson v. State,* 43 Conn. 514, 527, 21 Am. Rep. 669. It was there used in arguing that, under such circumstances, an accused would not be guilty of murder in the first degree. This is a very different thing than saying that under such circumstances he would be guilty of murder in the second degree. It is apparent that all these circumstances could exist and the killing be perpetrated in the heat of sudden passion aroused by sufficient provocation to reduce the crime to manslaughter. Yet the request of the accused asked the court to instruct that the verdict under the circumstances named must be for murder in the second degree. . . . . It made clear to the jury that, if the 'circumstances in which the accused was placed and the atmosphere surrounding him' was such when he shot the woman as to constitute adequate provocation, their verdict might be manslaughter, but if not adequate for this, but sufficient to prevent deliberation and premeditation, the verdict might be murder in the second degree. The accused was benefited rather than injured by the explanation."

Reference is made in Weihofen to two articles in the Harvard Law Review, by Professor Keedy, discussing the proposed test of insanity as promulgated by the Institute of Criminal Law and Criminology. The pertinent portions of the proposed bill being Section 1 as follows:

"Sec. 1. When Mental Disease a Defense. No person shall hereafter be convicted of any criminal charge when at the time of the act or omission alleged against him he was suffering from mental disease and by reason of such mental disease he did not have the particular state of mind that must accompany such act or omission in order to constitute the crime charged."

In addition to the fact that the requested instruction was subject to the criticism in the above case, is the fact that it was erroneous because it proceeds upon the unjustified theory that there is a distinction between the amount of mental ability necessary in premeditation and deliberation, and malice. The discussion of the authors and the cases discloses that upon a careful analysis the thought contained in the instruction is not based on the definition of murder in the first or second degree as defined in our statutes, but the distinction between murder in the first and second degree as variously defined in other jurisdictions and manslaughter, because in manslaughter there is an absence of specific intent or state of mind necessary to constitute malice aforethought or deliberation and premeditation.

*Vide,* Professor Keedy makes a distinction, page 538 and running over to page 541, vol. XXX, No. 6, which distinction is emphasized by the discussion of offenses where no particular state of mind is essential. The same is quite apparent from a further discussion of the point in Professor Weihofen's work, page 413, subdiv. 2:

" . . . . (2) cases in which by reason of mental disorder, the person was incapable of deliberation, premeditation, malice, or other mental state usually made a requisite for first degree offenses, and in which, therefore, a lesser offense than that charged was in fact committed. No allowance is made for the first type, as we have said. The second is taken account of only in eight or nine states. While logically, there is no reason why mental disorder should not be given the same consideration as intoxication in determining the defendant's capacity to entertain the criminal intent requisite to the crime charged, nevertheless, the acceptance of this doctrine would raise certain difficulties."

We thus have to come to the point of refinement that a man might be capable mentally of entertaining malice aforethought but his mind might be so deficient as to not entertain deliberation and premeditation.

No case has been cited which clearly makes such a distinction and the language used in the cases cited by Professor Weihofen negatives such distinction.

*Aszman v. State,* 123 Ind. 347, 24 N. E. 123, at 125, 8 L. R. A. 33, discussing this question makes as its pivotal point: " . . . . So in *Buckhannon v. Com.,* 86 Ky. 110, 5 S. W. 358, the court said: 'A deliberate intent to take life is an essential element of murder. Drunkenness, as a fact, may therefore be proven, as bearing upon its existence or non-existence. It is not admissible upon the ground that it, in and of itself, excuses or mitigates the crime, because one offense cannot justify or palliate another, but because, under the circumstances of the case, it may tend to show that the less and not the greater offense was committed. . . . . "

While intoxication was there being discussed, it was a question of mental condition and we recognize the distinction.

Under our statute, murder in the second degree must have malice aforethought, which might be expressed or implied, and the jury was so instructed in instruction No. 7, *supra.*

And as we have shown above as to state of mind, there is no distinction between express or implied malice. Therefore if the courts have recognized that if a person's mental condition is such by the right and wrong test as given the jury herein that he is capable of entertaining malice aforethought, no case holds that such mind is not capable of premeditation and deliberation. Intent to take life or the mental state of having an abandoned and malignant heart which means, of course, a condition of mind and which therefore is a mental state is the essential ingredient of murder in the second degree.

*Robinson v. State,* 113 Ind. 510, 16 N. E. 184, considered larcenous intent and makes no distinction between the intent to take life and premeditation and deliberation so far as the different mental ability or, inaccurately used, "a mind less afflicted by insanity."

*Hopkins v. State,* 180 Ind. 293, 102 N. E. 851, merely says that:

"Appellant's mental condition would have been competent under the plea of not guilty, as a proper subject of cognizance by the jury, in mitigation of the offense, but it was not suggested on the evidence or anywhere in the record."

If the requested instruction had been couched in language suggesting this thought, a different question would be presented, but the requested instruction said the defendant would be guilty of murder in the second degree if he could not deliberate and premeditate, but the appellant has not shown wherein if he could not deliberate or premeditate the proper instruction would not have been that given, in effect that he should be acquitted.

No distinction is made between malice aforethought and premeditation and deliberation in *State v. Close,* 106 N. J. L. 321, 148 Atl. 764.

*Davis v. State,* 161 Tenn. 23, 28 S. W. (2d) 993, was considering the distinction between murder and manslaughter, at 996:

" . . . . It is not necessary that a defendant's reason be dethroned to mitigate a killing to manslaughter. . . . . If the excitement and passion adequately aroused obscures the reason of the defendant, the killing will be reduced to manslaughter. . . . . A defendant acting under such temporary mental stress is presumed to be incapable of malice, an essential of murder."

The same is true in *Hempton v. State,* 111 Wis. 127, 86 N. W. 596, and *Oborn v. State,* 143 Wis. 249, 126 N. W. 737, 31 L. R. A., N. S., 966.

The language in *People v. Moran,* 249 N. Y. 179, 163 N. E. 553 on a somewhat similar situation is pertinent:

"The defendant is a 'psychopathic inferior', a man of low and unstable mentality, and, in all probability, a sufferer from epilepsy.

"Even so, the evidence is not so strong as to exact a finding from the jury that he was mentally irresponsible, within the meaning of Penal Law (Consol. Laws, c. 40) § 34. He knew the nature and quality of the act, and knew that the act was wrong. It is the law of New York, made binding upon

the court by the enactment of a statute, that a youth of that order of mentality shall suffer the penalty of death if guilty of the crime of murder. The rigor of the law may be mitigated by the Governor, when the hardship of applying it is excessive or exceptional. There can be no other relief in the face of the mandate of the statute.''

Was there evidence in the record here showing a mental condition on the part of the defendant from which the jury might have, if further instructed than they were, concluded that he had sufficient mental ability to entertain malice aforethought but not premeditation and deliberation? The three physicians called by the defendant testified that he was insane at the time he killed or was supposed to have killed his wife; that he did not know right from wrong, and one testified that he was suffering from a delusion that deceased visited him in his cell, evidently giving such claimed occurrence a retroactive interpretation, and suffering from a form of insanity known as maniac depressive, that he was in a stupor and did not know what he was doing or what he had done. As is indicated above, there was also collateral and ancestral insanity, both maternal and paternal. No attempt however was made to draw any line of demarcation between ability to entertain malice aforethought or deliberation and premeditation.

Insanity to relieve from legal responsibility under the so-called common-law rule is the lack of mental ability to distinguish between right and wrong and know and appreciate the moral consequences of one's acts, which historically has always been applied to malice and deliberation and premeditation. To recognize the so-called reduction rule one must in effect proceed upon the premise that the right and wrong rule, character of the act and consequences test establish the defendant's ability to possess malice aforethought or responsibility for murder in the second degree, and that in addition, first, it requires more mentality to deliberate and premeditate and that there must be some additional standard but what? Not only must the defendant pass the first, but be able to deliberate and premeditate. How are the jury to determine this? No test has been given the jury, and they are left without a standard of mental ability. Conceding that

the first is not as definite or scientific as it should be, what is the basis for considering that it takes greater mentality to deliberate and premeditate than to entertain malice aforethought? True it may be express or implied.. The first certainly is a mental state, and the second also because the necessity for implication is only a rule of evidence as to how the condition is proved, not that such condition must not exist.

Under the instructions given, if the defendant did not have mentality to deliberate and premeditate, the jury would not have been justified in concluding he could have held malice aforethought, yet the instruction requested would have held him for murder in the second degree, even if the reduction should have been given, the wording was erroneous and properly refused, and under the former decisions of this court the defendant would have been prejudiced by its promulgation.

There are three reasons therefore why the requested instruction was properly refused. First, it would have prejudiced the defendant because it would have required the jury to find him guilty of murder in the second degree, while under the instructions given, the jury might have found him not guilty, or guilty of a lesser offense. Second, no basis in law for a distinction between the mental ability to entertain deliberation and premeditation, and malice aforethought has been presented. Third, such line of demarcation was not and has not been pointed out in the evidence adduced by either party. On this point, because of the seriousness of the situation we have quoted these portions of the instructions (Instructions Nos. 18, 19, and 20, *supra*) which on the evidence adduced and the defense of insanity as urged by the defendant stated the issues with sufficient clarity to the jury.

Conceding the testimony, adduced by the defense as to appellant's claimed insanity, all intendments in its favor, at most a mere conflict on this phase of the case is presented, because there was ample and entirely plausible evidence leading clearly to the conclusion that appellant was sane during the entire period of his acquaintance with deceased and up to and including the time of the trial. In fact the cross-examination of the physicians for the defense would have justified the jury in concluding there was not even a conflict in the evidence but that the statements of the physicians for

the defense established defendant's mental ability to the extent that he is and was legally responsible for all his acts; in other words, a fair reading of all the testimony could well justify any reasonable jury in finding defendant sane.

 After the jury had adjourned to deliberate, they asked the court by note:

"If after we find the defendant guilty as charged and impose the death penalty, and the defendant then becomes insane, are we assured that he will not be put to death? Will the defendant be examined as to his sanity before being put to death by an unbiased medical comm."

The court then responded:

"Gentlemen of the jury, in answer to your request for information, delivered to the judge of the court by the bailiff, and attached hereto, the Court now says to you that the information requested in the inquiry does not come within the scope of your duties as jurors. Your inquiry is a matter not subject to your consideration, being directed to matters which can be attended to and disposed of under the law by other procedure not now involved, and with which you as jurors are not concerned.

"The instructions already given you cover the law of the case and you are to be guided thereby."

Appellant contending:

"It would appear from the foregoing Instruction to the jury that its effect would be to relieve the jurors of the final responsibility in deciding whether or not the appellant should, in fact, suffer the penalty of death, and that in the frame of mind the men serving on that jury were, as shown by their examination on their *voir dire,* they would have no hesitancy in inflicting the death penalty. The appellant seriously contends that the Court's Instruction to the jury in answer to their question was error and highly prejudicial to the appellant."

The answer of the court was not erroneous as the condition of the defendant's mind at the time of the execution of the punishment was not for their consideration. The execution of the punishment fixed by the jury being in the future, appellant's future state of mind could not be considered by them in arriving at their verdict or fixing their punishment,

and would be something they would have nothing to do with, and appellant does not suggest how otherwise the jury should have been instructed on this point. The question propounded does not indicate that the jury was hesitating at all about fixing the penalty, or that they wished to make it life imprisonment instead of death.

By assignment of error No. 32, appellant complains because the court did not submit a form of verdict whereby the jury could have found the defendant guilty of murder in the first degree without any recommendation as to the penalty. Under the statute, while the language is permissive, the obligation in the first instance is placed with the jury to fix the penalty in murder of the first degree, and while if they do not do so the court is charged with the task, it was not error for the court to not submit a form of verdict placing this responsibility on him.

By his last assignment of error, appellant urges that the evidence is insufficient to sustain the verdict of the jury and the judgment of the court, setting out in particular the lack of connection between the bullet found in the culvert under the body of deceased, the death of deceased, and appellant. The evidence on this point is uncontradicted that deceased met her death from a bullet wound, apparently inflicted while she was in the same position as when found, the bullet passing through her head, and no other hypothesis has been offered by appellant negativing the possibility and probability that the bullet found in the culvert was the one which caused deceased's death.

By way of linking appellant with the crime with which he was charged, Mr. E. M. Sweeley was called as a ballistic expert for the State, and testified as to his examination of the gun found upon appellant, and experiments that he carried on in connection with identifying bullets fired from the gun in question, as having the identical markings as the bullet alleged to have killed deceased. The bullet identification herein was conducted by firing several bullets of the same size and make as the "subject" bullet, that is, the one which allegedly killed deceased, in the gun taken from the possession of appellant; these specimens are called "exemplars." These exemplars were obtained by shooting the bullets into oiled

oat meal or rolled oats, backed by a layer of wet newspapers, in order to preserve the identifying marks made by the "lands" and "grooves" which compose the rifling of the barrel. Since the subject bullet herein was deformed somewhat, only five lands were available to the witness for identification, but he testified that he had completed an identification from the comparison of only one land. The accompanying enlarged photograph is a copy of plaintiff's exhibit "F," which Mr. Sweeley had prepared under his supervision, showing the subject bullet, in the middle row in five different positions. The top row shows an exemplar bullet in the same five different positions, and the bottom row is a picture of another exemplar bullet in five different corresponding positions. In each of these pictures the bullet has been turned one space to the left; that is, the land cut that appears at the right side of each of the pictures is next placed so that it appears in the center, and this is continued all the way through. Captain Sweeley testified:

" . . . . On the first picture to the left the right hand edge of the land cut can be compared visibly from the top to the bottom or from the bottom to the top; and the characteristic cut found in the subject bullet on the right hand edge of the land cut I find to appear both in the top exemplar and in the bottom exemplar. In the next, which is the second from the left, the land cuts in the exemplar bullets have not been erased. The left hand edge cut from the subject bullet is slightly short of the right hand edge cut, and an examination of the exemplar bullet discloses the same condition to exist on each of those. In the third image, which is in the middle, I find in the subject bullet a broad cut on the right hand edge of the land cut, which appears square in section, whereas, in the other cuts, the line is more of a bevel, and that the right hand edge cuts in the center image extends very noticeably farther than does the left hand cut, and when I compare it with the exemplar bullets at each end I find exactly the same condition to obtain in each of those. In the lower exemplar bullet are two marks, in the form of light circles, which marks were made to assist in my identification of my exemplar, and are not part of the marks made by the gun. In the fourth series from the left hand end there is a wavy

black line appearing on the top bullet, which is due to a crack in the glass slide, due, I am informed, to the heat of the machine that casts the picture. In this fourth series of images I observe that on the subject bullet the two land cuts, both right and left, are of almost exactly the same length, the right one being a very little longer than the left, and when I examine and compare with the exemplar bullets, above and below, I find the same condition to exist there. In the space to the right of the land cuts shown in the fourth bullet I observe a double line, or indication of lines, in which a gap, or light mark, appears, where the bullet was not of sufficient diameter to reach the bottom of the groove, and when I compare with the exemplar bullet at the top, and again with the exemplar bullet at the bottom, I find that mark repeated, although, in the subject bullet, a portion of that mark has been—a portion of that groove mark—has been erased and does not show in full length, but it does show the existence of the lines to which I have called attention. In the fifth series, which is at the right of the image, in the subject bullet I find that the land cuts have been somewhat distorted by reason of the flattening of the bullet; however, the right hand edge of the cut corresponds in shape and in length with the right hand edge of the cuts on both exemplar bullets, and, while it is not so plain, it can be seen that the two land cuts are of almost exactly the same length, and I find the same condition to obtain in both the top and bottom exemplars.''

From this investigation, witness Sweeley testified that he was of the opinion that Exhibit ''E,'' the bullet alleged to have killed deceased, was fired from the gun found in appellant's possession, Exhibit ''A.'' Exhibit ''C,'' a shell found near deceased's body, was also identified as having been shot by appellant's gun, by witness Sweeley. Since appellant has produced no contradictory testimony on this subject, the evidence adduced by Captain Sweeley is particularly persuasive.

Other evidence in the record which sufficiently established a basis for the jury's evident conclusion that defendant was the one who killed deceased, were the threats that appellant made against the life of deceased to her parents upon certain

contingencies, which contingencies transpired and she was killed, and appellant does not deny making the threats. Deceased saw appellant shoot and kill the two peace officers, and evidently he thought she was a hindrance in making his escape, himself testifying that they both decided he could better escape if she were to leave him. His proximity to the scene of the crime was additional evidence; and that he had a motive for the killing whereas there was an utter lack of motive for anyone else to commit the crime was also material. Appellant's own confessions and admissions although later denied were competent as proof and evidence of guilt. Also the jury could take into consideration the demeanor and general appearance of the appellant on the witness stand and any contradictory statements he made during the trial of the case. (16 C. J., p. 762, sec. 1566.) All of this evidence was competent and amply sufficient in law to sustain the conviction of appellant of wilful, deliberate and premeditated murder of deceased with malice aforethought, being murder in the first degree.

"There are a number of circumstances surrounding the commission of the crime charged which we have not attempted to set out in detail but which no doubt were given much weight by the jury; and the acts and movements of the defendant before and after the killing no doubt were suggestive to the jury that a person would not pursue the course taken by the defendant unless he was conscious of his own wrongdoing, and was able to distinguish that by his acts he had clearly transgressed the laws of his state and was willing to surrender himself to answer therefor; and to our minds, the evidence of sanity preponderates and outweighs the professional testimony of the expert as to his opinion based upon certain evidences he discovered from an examination of the defendant. . . . . " (*State v. Fleming, supra,* 17 Ida. 471 at 495, 106 Pac. 305.)

" . . . . Where circumstantial evidence is relied upon to prove guilt, it is sufficient to warrant a conviction when the evidence shows, first, the homicide; second that the person charged had the opportunity to commit such murder; third, that a motive is shown for such killing, and the circumstances establishing these facts are so connected as to exclude every

other rational hypothesis than that of guilt." (*State v. Marren,* 17 Ida. 766 at 776, 107 Pac. 993.)

"All evidence which legitimately tends to show that the defendant had the opportunity of committing the crime of which he is charged is clearly admissible as going to establish his connection therewith; and likewise, evidence tending to show that the accused, prior to the act, had the means by which the offense was committed, is admissible. The admissibility of circumstantial evidence in criminal cases is too well established to need the citation of authority. Most crimes being committed in secret, if the direct testimony of eye witnesses were required, but few convictions could be had. Circumstantial evidence is the proof of certain facts and circumstances in a given case from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind. To render evidence of collateral facts competent there must be some natural, necessary, or logical connection between them and the inference or result which they are designed to establish. It may be laid down as a safe rule that in no case is evidence to be excluded of any fact or circumstance connected with the principal transaction from which an inference as to the truth of a disputed fact can reasonably be made. . . . . " (*State v. McLennan,* 40 Ida. 286 at 302, 303, 231 Pac. 718.)

"We have endeavored to set out what we consider the material facts which were submitted to the court and the jury. The solemn duty rested upon the jury to determine from the facts the guilt or innocence of appellant. Both the court and the jury had an opportunity to observe the witnesses and accused and their manner of testifying and to determine therefrom the probability of the truth or falsity of their testimony, and the reasonableness or unreasonableness of the explanation made by the accused touching certain evidence offered by the state. It was for the jury to determine whether the accused had been impeached or contradicted as to certain material facts about which he testified. The crime was committed under cover of darkness and is revolting in its details. The evidence, it is true, is circumstantial, but from a careful examination of the entire record

we are satisfied that there is sufficient competent evidence to support the verdict of the jury and the judgment based thereon, and no error was committed by the court in overruling the motion for new trial upon this ground.'' (*State v. Caviness,* 40 Ida. 500 at 512, 513, 235 Pac. 890.)

*State v. McClurg,* 50 Ida. 762, at 798, 300 Pac. 898; *State v. Fox,* 52 Ida. 474, at 486 and 496, 16 Pac. (2d) 663; Wharton, Homicide, p. 895 et seq.; Wharton, Criminal Law, vol. 1, p. 470, secs. 361, 362.

Finding no error in the trial below the verdict of the jury and the judgment of conviction carrying the death penalty are hereby affirmed.

.Morgan, C. J., Holden, J., and Winstead, D. J., concur.

Winstead, D. J., sat in place of Ailshie, J., who deemed himself disqualified, his son being of counsel.

BUDGE, J., Specially Concurring.—After examination of the record in this case I am fully satisfied that the judgment should be affirmed. However in my opinion assignment of error numbered ''1'' that ''the trial court erred in denying defendant's motion for a continuance'' is not here for review. The rule is well established that where the substance of the motion for a continuance does not appear in the record, files, minutes or transcript, the motion is not subject to review. (I. C. A., sec. 19–2301.) Likewise the court's ruling on a motion for a continuance is assumed correct where the showing made in support of such motion is not before the appellate court for review. (*State v. Leavitt,* 44 Ida. 739, 749, 260 Pac. 164; *State v. Murray,* 43 Ida. 762, 254 Pac. 518; *Hadley v. State,* 25 Ariz. 23, 212 Pac. 458.)

No prejudicial error was committed by the trial court in the admission or exclusion of evidence.

When the instructions are considered as a whole, those given state the law as applied to the facts and those rejected were properly refused.

The evidence is amply sufficient to support the verdict. of the jury and the judgment of the court based thereon.

Petition for rehearing denied.